See also, Mo., 529 S.W.2d 418.

**XEROX CORPORATION et al., Respondents,**

v.

**STATE TAX COMMISSION of Missouri et al., Appellants.**

No. 58850.

Supreme Court of Missouri, En Banc.

Nov. 10, 1975.

Rehearing Denied Dec. 8, 1975.

James J. Wilson and Jack L. Koehr, St. Louis, John C. Danforth, Atty. Gen., Walter Nowotny, Asst. Atty. Gen., George W. Lang, II, and Thomas Wehrle, Clayton, for appellants.

Robert G. Brady, Michael B. McKinnis and Don G. Lents, Bryan, Cave, McPheeters & McRoberts, St. Louis, for respondents.

DONNELLY, Judge.

This case involves tax assessments for the year 1972 on personal property belonging to Xerox Corporation and Mohawk Data Sciences Corporation and leased to users in the City of St. Louis and in Buchanan County, Clay County, Jasper County, Pulaski County, St. Charles County and St. Louis County. It was stipulated by the parties in the appeals before the State Tax Commission that the transcript in the Xerox case should be regarded as the formal record for all cases. The Conclusions of Law filed by the Commission in the Xerox case are as follows:

"The sole question in this case is what is the correct valuation to be placed on Xerox's equipment, which it leases to the general public. Under Section 137.115, it is provided that the basis on which assessment shall be made is the 'true value in money' of the property. In applying this standard, we must all recognize that 'true value in money' does not mean an absolute true value, but is at best a mere estimate. See *Stein v. State Tax Commission*, 379 S.W.2d 495. Additionally, it is presumed, in accordance with the law, that the Assessor's valuation is correct unless shown in some respect to be incorrect. *Foster Brothers Manufacturing Co. v. State Tax Commission*, 319 S.W.2d 590. The burden of overcoming this presumption lies with Xerox. There is no question but that this Commission has the authority to correct any assessment which is shown to be unlawful, unfair, improper, arbitrary, or capricious. Section 138.430, RSMo 1969.

"The evidence presents two very different ways of arriving at a valuation of the equipment involved. The Assessor and the Board of Equalization have used a gross multiplier formula of fifty times average monthly rental divided by three. This formula has long been in use in the City of St. Louis, although elsewhere in Missouri the formula customarily used employs a forty multiplier rather than a fifty multiplier. From the point of view of tax administrators, the application of such a formula is undoubtedly convenient, fast, and time saving. Although it is a widely-accepted way of assessing rental property, it admittedly has drawbacks and inequities.

"The Xerox approach to valuation necessarily has to be indirect because there are virtually no sales of Xerox equipment to use as a basis for market value. Consequently, Xerox sought to establish market cost, to which a markup was applied. The markup was itself established through comparison of markups on equipment manufactured by Burroughs, National Cash Register, Addressograph and Multigraph, all of whose machines are sold in the market place. The markup determined was approximately 75% over manufacturer's cost, where the equipment was in the hands of a company like Xerox. In non-Xerox hands, the markup would be reduced to 65%. In this approach, however, we feel that there is a very serious question presented as to what costs should be regarded as manufac-

turer's costs. Admittedly, a number of these costs, such as the cost of management, promotion, advertising, and others, are not assigned by Xerox to cost of manufacture, but are allocated as costs of carrying on the leasing business.

"Xerox also sought to establish true value by an analysis of Xerox stock. By virtue of a complicated analysis of the capital structure of the Company, all of which has heretofore been set out, Xerox sought to show that the required overall return of this equipment would have to be 16.59% in order to be a good investment for the owner of the equipment. By extrapolating these figures, and accounting for Federal and Missouri Income Taxes, depreciation, and return of risk capital, Xerox concludes that equipment producing a net income of $2,944,021 would have a value ranging from $5,700,000 to $7,000,000.00.

"We have considered all the foregoing, and are of the view that a gross multiplier formula, for reasons which we have many times previously expressed, will produce a practical and sensible value of the equipment in question which satisfies us, at least, as an acceptably close approximation of the true value of this equipment. Both the Xerox methods used, and the gross multiplier method, employ many factors which are both intangible and arguable. Consequently, we feel that in the present case the gross multiplier formula is acceptable, with the modification that a multiplier of forty rather than fifty be applied. We therefore conclude that the proper assessment valuation of Xerox's leased equipment in the City of St. Louis is $6,715,415.00. To this must be added $43,215.00, applicable to Xerox's equipment other than that which is leased out. The total assessment valuation therefore is $6,758,630.00."

An appeal was taken by Xerox and Mohawk to the Circuit Court of Cole County, which reversed the Commission and held "that the Commission's decisions were unlawful, were not supported by competent and substantial evidence upon the record as a whole, and were arbitrary, capricious and discriminatory." The Commission and other defendants appealed to this Court. We have jurisdiction because the issues involve construction of the revenue laws of this state. Mo.Const. Art. V, § 3.

■ Appellants' basic assertion is that the "Circuit Court erred in reversing the decision of the State Tax Commission in that it sought to substitute its discretion for that vested in the Commission, in respect to the adoption of a proper method for the valuation of leased business machine equipment for ad valorem tax purposes." We agree.

In 1955, Professor Louis L. Jaffe (Jaffe, *Judicial Review: Question of Law*, 69 Harv. L.Rev. 239, at 260 and 261), expressed the following point of view:

". . . But I would urge that there is a presumption (subject to rebuttal) that a rule-making or order-making agency with a specialized jurisdiction is meant to have some discretion, some policy-making function.

"It is at this point that we come to the heart of the difficulty. Discretion, as we have said, is not self-defining; it does not arise parthenogenetically from 'broad' phrases. Its contour is determined by the courts, which must define its scope and its limit. Put in terms of judicial review: why do courts sometimes pronounce the law and sometimes not? Put in terms of administrative power: why are agencies sometimes permitted to make law and sometimes not? *The answer, I submit, should run primarily in terms of clear statutory purpose.* I am aware that in many instances attribution of the result to the statute will be formal; that the decision will have been made somehow or other and then the result stated in terms of statutory purpose. But this formulation has the value of directing our attention toward the one most significant criterion. Furthermore, when we say 'run in terms of' statutory purpose we have in mind a concept of statutory purpose

which takes account of the fact that the legislature in realizing its purposes has chosen to work through an administrative agency, and so (presumptively as we have said) to confer on it some policy-making function. This discretion should be permitted to function short of the point where the court is convinced of the *clear* purpose of the statute. The court, we have said, should test each exercise of power in terms of statutory purpose. But in a great many cases the court will grant that any one of two or more proposed answers is consistent with the statute. This is true of most statutes but particularly of a vaguely phrased administrative statute. In such a situation agency choice should stand. It is in as good a position, and because of its specialization presumptively in a better, to make the choice. There is, furthermore, a value in this recognition of administrative autonomy; it may invigorate the sense of responsibility, stimulate initiative, and encourage resourcefulness."

Section 138.235, Subsection 2, RSMo 1969, requires that the State Tax Commission "shall investigate companies which have tangible personal property for lease or companies which lease tangible personal property, to cause said property to be properly taxed within this state."

Section 138.410, Subsection 1, RSMo 1969, provides that the State Tax Commission "shall exercise general supervision over all the assessing officers of this state, over county boards of equalization and appeal in the performance of their duties under this chapter and all other laws concerning the general property tax and shall institute proper proceedings to enforce the penalties and liabilities provided by law for public officers, officers of corporations and individuals failing to comply with the provisions of this chapter, and of all laws relating to the general property tax."

■ We are persuaded that these statutory provisions manifest a "clear statutory purpose" that the State Tax Commission, in the exercise of its administrative discretion, may choose the gross multiplier formula as the method to be used in taxing leased tangible personal property. In performing this *particular* function, the Commission is acting as "an 'administrative arm' of the Legislature," and its actions are primarily "legislative in character." *Missouri Southern R. Co. v. Public Service Commission*, 279 Mo. 484, 214 S.W. 379, 380 (1919). In this *particular* situation, involving the exercise of administrative discretion, we believe the courts should not interfere unless there is an abuse of such discretion. We find no abuse of discretion here.

Xerox and Mohawk contend the gross multiplier formula fails to account for obsolescence, depreciation, maintenance expenses, leasing expenses and taxes.

In *Somers v. Meridan*, 119 Conn. 5, 174 A. 184, 186 (1934), the Court stated:

"It is true that, in the final analysis, it is the net income rather than the gross which affects values, but there is no inflexible rule for ascertaining the deductions to be made from the gross for the purpose of obtaining the net. If the percentage used in capitalizing gross income is sufficient to cover the deductions allowable in producing net, the result will satisfy this requirement."

In this case, the City of St. Louis used a formula of multiplying the monthly rental by *fifty* and dividing by three. The Commission reduced the multiplier from *fifty* to *forty*. If, by this reduction, the Commission used a multiplier "sufficient to cover the deductions allowable in producing net," the result satisfies the requirement of finding a reasonable approximation of true value.

Witness Joseph C. Sansone testified as follows:

"Q Did you participate in any studies made by the State Tax Commission in connection with the use of a gross multiplier formula?

"A Yes.

"Q When were those studies made, if you recall?

"A About 1966.

"Q And what was the nature of those studies, or how were they conducted?

"A Well, I think it was conducted on a formal basis. The members of industry were requested to come in with various information in regard to their products, and to present them to that body and discuss them.

"Q Were those studies that you participated in with the State Tax Commission also a basis for your opinion as to the use of the gross multiplier?

"A Yes. In fact, at that time, the Commission chose to use 50 times, and at a later date reduced it to another figure."

In *City of St. Louis v. State Tax Commission*, 505 S.W.2d 75 (Mo.1974), equipment leased by IBM was involved. The City Assessor adopted a formula of multiplying the monthly rental by *fifty* and dividing by three. IBM submitted a formula of multiplying the monthly rental by *forty* and dividing by three. The State Tax Commission adopted the forty multiplier and the City appealed. This Court said (at page 81):

"The Commission undoubtedly adopted that formula in compliance with its statutory mandate to exercise general supervision over assessing officers and to specifically investigate companies which lease tangible personal property in order to cause such to be properly taxed. In that situation it would be presumed that the Commission performed its statutory duties and made an appropriate investigation and based the formula adopted upon facts obtained thereby. As indicated, we have concluded that such formula considered with the fact that it has been widely accepted by assessing officers constitutes substantial evidence to support the findings of the Commission. We do not mean to say, however, that a formula adopted by the Commission is impervious to attack. It would appear

that on a hearing before the Board or Commission relevant evidence should be considered which would tend to show that the formula produced an assessment which was either more or less than true value. Appellants presented evidence concerning the basis for adoption of their formula and we consider such to be substantial evidence. The Commission, however, as the fact finder, determined that the formula used by the Assessor resulted in a valuation which was not the true value but was unlawful, unfair, arbitrary or capricious. We cannot say that such a finding was an abuse of discretion or unsupported by competent and substantial evidence. The decision certainly may not be said to be 'clearly contrary to the overwhelming weight of the evidence'. *Wood v. Wagner Electric Corporation*, 355 Mo. 670, 197 S.W.2d 647, 649 (1946)."

In the present situation, we know from Witness Sansone's testimony that the Commission "made an appropriate investigation." We can presume that the Commission "based the formula adopted upon facts obtained thereby."

In *St. Joseph Stock Yards Company v. United States*, 298 U.S. 38, 80–82, 56 S.Ct. 720, 738, 80 L.Ed. 1033 (1936), Mr. Justice Brandeis, concurring, addressed the problem of "giving finality to assessments of value made for the purpose of ad valorem taxation," referred to certain cases previously decided by the Court, and stated:

"These cases show that in deciding when, and to what extent, finality may be given to an administrative finding of fact involving the taking of property, the Court has refused to be governed by a rigid rule. It has weighed the relative values of constitutional rights, the essentials of powers conferred, and the need of protecting both. It has noted the distinction between informal, summary administrative action based on *ex parte* casual inspection or unverified information, where no record is preserved of the evidence on which the official acted, and

formal, deliberate quasi-judicial decisions of administrative tribunals based on findings of fact expressed in writing, and made after hearing evidence and argument under the sanctions and the safeguards attending judicial proceedings. It has considered the nature of the facts in issue, the character of the relevant evidence, the need in the business of government for prompt final decision. It has recognized that there is a limit to the capacity of judges, and that the magnitude of the task imposed upon them, if there be granted judicial review of the correctness of findings of such facts as value and income, may prevent prompt and faithful performance. It has borne in mind that even in judicial proceedings the finding of facts is left, by the Constitution, in large part to laymen. It has enquired into the character of the administrative tribunal provided and the incidents of its procedure. Compare *Humphrey's Executor v. United States*, 295 U.S. 602, 628, 55 S.Ct. 869, 79 L.Ed. 1611. And where that prescribed for the particular class of takings appeared 'appropriate to the case, and just to the parties to be affected,' and 'adapted to the end to be attained,' *Hagar v. Reclamation District*, 111 U.S. 701, 708, 4 S.Ct. 663, 667, 28 L.Ed. 569, the Court has held it constitutional to make the findings of fact of the administrative tribunal conclusive. Thus, the Court has followed the rule of reason."

Our decision today should not be considered an abandonment of the traditional role of the courts in reviewing administrative decisions. It should be construed as indicating only that we consider the adoption of the gross multiplier formula an action properly within the administrative discretion of the State Tax Commission, and that we find no abuse of discretion.

The judgment is reversed and cause remanded with directions to reinstate the order of the State Tax Commission.

MORGAN, Acting C. J., HOLMAN, BARDGETT, HENLEY and FINCH, JJ., and SIMEONE, Special Judge, concur.

SEILER, C. J., not sitting.