HERMEL, INC., Appellant,

v.

STATE TAX COMMISSION of Missouri,
et al., Respondents.

No. 59824.

Supreme Court of Missouri,
En Banc.

April 24, 1978.

J. Bruce McCurry, Springfield, for appellant.

Theodore L. Johnson, III, Springfield, for respondent.

BARDGETT, Judge.

Hermel, Inc., appeals from the judgment of the circuit court affirming a decision of the State Tax Commission which set a valuation on appellant's property in Greene County, Missouri. This case involves the valuation for 1971 (the valuation date is January 1, 1971; sec. 137.080, RSMo 1969) state and county property taxes of the Battlefield Mall (mall) in Springfield, Missouri. The mall is owned by appellant, Hermel, Inc., (Hermel), an Indiana corporation. Hermel challenges the assessment of the State Tax Commission (commission) as being unlawful, unfair, improper, arbitrary, and capricious. This dispute involves only the valuation of improvements on the land, not the valuation of the land itself.

A brief history of this litigation is in order. The commission rendered its original decision on December 3, 1971, fixing a land value of $1,441,612 and an improvement value of $9,000,000. Greene County then filed a petition for review seeking a higher assessment on the improvements. The circuit court found the decision of the commission arbitrary and not supported by competent and substantial evidence. The cause was remanded to the commission with instructions to reinstate the assessment of the county assessor, who valued the land at $1,441,612 and the improvements at $11,-744,909. Hermel appealed to this court.

In *Greene County v. Hermel, Inc.*, 511 S.W.2d 762, 770 (Mo.1974), the judgment of the circuit court was reversed and the cause was remanded for another hearing because the decision (valuation) of the commission was not based on competent and substantial evidence. A second hearing was held and this time the commission in its decision of November 7, 1975, found the true value to be $1,441,612 for the land and $11,744,909 for the improvements. These were the figures originally determined by the assessor to represent the true value of the land and improvements. The circuit court affirmed and Hermel appealed to this court.

Because of the issues presented, it is necessary to review the evidence before the commission. As the transcript of the first hearing was admitted as evidence in the second hearing, a review of the evidence proffered in both hearings is required. A summary of the evidence from the first hearing will be taken as needed from *Greene County v. Hermel, supra*, without use of quotation marks.

At the first hearing the following evidence was presented: The mall, located in Greene County, Missouri, consists of about 60 acres of land and a building approximately 1400 feet long containing 40 to 50 stores (on rehearing the undisputed testimony was that 60 stores were in operation on January 1, 1971) and an enclosed mall. The mall was opened for business in July of 1970.

Mr. Elliott Freed, Hermel's vice-president in charge of the construction, produced the final request of the general contractor for payment, with credits for previous payments, and testified that Hermel had paid those amounts. The total listed was $7,036,935.25, (the commission found this amount to be $7,072,495.25), but to this Mr. Freed added the amount paid to another contractor and the sum of the amounts allowed and paid to tenants for the completion of their respective stores "in a normal manner," arriving at a grand total of $8,362,884 (the commission found this amount to be $8,305,363.25). This figure, Mr. Freed said, represented the cost of the building. He also presented an exhibit which showed the cost as apportioned by the contractor to separate stores and sections of the building; this exhibit also showed, by way of comparison, the assessment figures (as received from the assessor) on the same stores and sections. The exhibit shows very substantial increases in the assessment of most of the units over their respective costs, but we are dealing here with the improvements as a whole. It is worthy of note, however, that the assessor arrived at his supposed replacement cost by computing it upon each separate unit, with no apparent relation to actual cost. Mr. Freed could not recall that he was ever asked by the assessor for figures on income or expenses; he testified that the annual net income from rents was approximately $1,390,000, with a provision in the leases for an additional percentage rental based on gross income as a "hedge" against inflation; no figure could be given on this latter item, since the stores had not been in operation for a full year as of January 1, 1971. The amounts allowed and paid to the tenants for completion of their respective store interiors were negotiated with the tenants; Hermel did not claim any interest in any property produced by expenditures in excess of these allowances and did not even know what totals were spent. It takes depreciation only upon the amounts allowed and paid. Mr. Freed testified that, "to his knowledge" he was not asked by the assessor for the construction costs; he furnished all of the figures to Mr. Duck of B. W. Duck and Associates who was selected to make an appraisal of the property. This firm had never been used by Hermel previously; after inquiry, Mr. Freed determined that none of the Springfield appraisers had time to do the job for Hermel. The deed of trust on this property contained a provision that the loan should not be more than 75% of the value of the property; the actual loan was $10,125,000. Mr. Freed assumed that an appraisal had been made at the time of the loan but testified that any then valuation was not his.

B. W. Duck of B. W. Duck and Associates of Indianapolis, Indiana, had been engaged in the business of real estate appraisals and management, and allied fields since 1933. He was a member of the American Institute of Real Estate Appraisers, and of various real estate organizations. He had spent a day in Springfield examining the property and making inquiries, had made various telephone calls for information thereafter, and had spent "weeks" in studying the matter and arriving at his computations. He testified: that there are three generally accepted approaches to the valuation of real estate, namely, the reproduction cost less depreciation plus the land value, the income capitalization approach, and the market data approach; that he had seen copies of various records of the assessor; that his computations on the different bases are shown in his report, which was received as an exhibit. He first showed, as the cost approach, a figure of $8,012,108.25 for the improvements after deducting $293,255 for grading and site work which he considered as a land cost; he testified that, since the appraisal was made as of January 1, 1971, and the mall had not been opened until July of 1970, the property had suffered no "Measurable depreciation"; he added a land value, but we are not concerned with that. He next considered the valuation from the income approach; he had examined the income figures in Hermel's office, but since the mall had not been open for a full year, it was necessary to make a projection of the rentals, including possible vacancies. He

examined certain of the leases. He arrived at a net annual income figure of $1,394,550. Upon an assumed rate of interest, a consideration of the taxes, and a useful life of 25 years he found a capitalization value of $8,472,691 for the improvements. The third method, the market data approach, was said to be a consideration of the sales or offers for sale of comparable properties. Mr. Duck found no comparable property in the Springfield area and used for comparison properties in Minneapolis, Denver and West Virginia. From these comparisons, first, on a square foot basis, and, secondly, by a "gross rent multiplier" derived from one of the properties and applied to ours, he arrived at a valuation of $8,590,000 for the property involved, on the market data approach. Mr. Duck further testified that upon a consideration of all three approaches or methods, he gave most weight to the income approach, next to the cost approach, and least to the market data approach, arriving at a weighted average value of $9,512,-000, including the land. This, of course, would leave a value of $8,100,400 on the improvements. It was Mr. Duck's opinion that "a shopping center today that is 25 years old is gone."

Two representatives of the assessor's office, Hugh Haseltine and Clyde Dusenberry, testified, collectively: that they had worked approximately a month in making this assessment; that they measured every store and each room, and prepared field notes and diagrams; that they arrived at a valuation of $11,744,909 on the improvements, using the replacement cost approach; that they did not have the income figures and that there were no other comparable properties in the area; that building costs had been rising all the time; that they did not "disbelieve" the evidence as to Hermel's overall costs, although they doubted that the hallways were built at the figure indicated; that in arriving at their replacement cost they used the "Kentucky Manual", a publication about ten years old, put out by the State of Kentucky, which consisted of a series of averages of costs; the assessment was based "partially" on this; that to the figures there shown they added 20% "on most items", and in some places more, using the manual as a base; that on some things they used "local costs"; that the Kentucky Manual does not fit any particular building, and there were no shopping centers when it was published; that the three recognized methods of valuation are the cost, market data and income approaches; that they utilized the cost approach and the result was simply their opinion; that at one time Mr. Freed and his counsel had given them a list of figures supposedly showing the construction costs, but that they did not use them.

Mr. Alva E. Koch, a Springfield real estate appraiser, testified for the County in substance: that he had reviewed the assessment and that the figure of $11,744,909 on the improvements represented about $17.50 per square foot of completed store area, excluding the hallways, and that this fell "within the range of construction of that type" as of January 1, 1971; that he had not examined or studied the property, having been contacted on "short notice"; that he heard Mr. Duck's testimony and felt that the capitalization rate which he used on income was high, and that the twenty-five-year life of the improvements was too low; that he did not make square foot comparisons of construction costs.

Two of the tenants of the mall testified (over objection) that they had spent substantial sums in excess of their respective allowances in completing and furnishing the interiors of their stores; one had spent a total in excess of $100,000 as compared with an allowance of $24,000; he thought that his firm depreciated these costs. The other tenant received an allowance of $59,940 and spent approximately $180,000. Some of the expenses on these stores included carpentry, tile, steel, heating, air conditioning, plumbing, painting, plaster, sheet metal, vinyl and wiring; the second tenant also depreciated the excess expense. A copy of the lease to Hermel from the fee owners of the real estate was offered and received in evidence. It called for payments of $65,000 per year, and Hermel was to pay the taxes.

The rehearing was held on July 15, 1975. Many of the witnesses who appeared at the

first hearing also appeared at the second hearing, along with updated testimony.

Mr. Freed was the first witness to testify. As noted supra, he was the vice-president of Hermel. His testimony generally followed that given at the first hearing. On cross-examination he stated that certain indirect costs, such as legal fees incurred in obtaining the land and preparing leases, the salaries of personnel employed to secure tenants, and the cost of interim financing, were not included in cost figures given at the first hearing. He said there were two types of stores constructed: "shell" stores which required the tenants to complete the interiors, and "turnkey" stores which were to be turned over to the operators with completed interiors ready for business. He did not know the exact sums expended by tenants in excess of the amounts given by Hermel (Hermel allowed tenants $545,938 for the purpose of finishing what were mostly store "shells" into individual stores as each tenant desired) for completion of the interiors of the stores, nor did he know what the money was expended on.

The testimony of Mr. Joseph M. Bramer was entered by way of deposition. Mr. Bramer was the vice-president and secretary of Bramer Construction which participated in the construction of the mall. His testimony tended to corroborate the testimony of Mr. Freed given at the first hearing. He stated that the replacement cost as of January 1, 1971, would have been essentially the same as the actual cost of the work done by Bramer Construction because the various factors which would inflate the cost of the work over the life of the contract, such as increases in the cost of labor and materials, were figured into the bid. He also testified that most of the construction work done by Bramer Construction was for interior completion. Some of this was under contract with individual tenants and some was under contract with Hermel. He did not know if more was spent in finishing interiors by the individual tenants than the allowances given by Hermel.

Hermel's next witness was Mr. G. Larry Kelly, executive vice-president of Pickens-Bond Construction Company, during construction of the mall. Pickens-Bond was under contract with Hermel for construction of the site and building, or shell. His testimony also corroborated Mr. Freed's testimony in the first hearing concerning the cost of the building. He testified that the cost as of January 1, 1971, would not have differed greatly from the 1969 bid of Pickens-Bond. Fulfilling their part of the contract took 18 to 20 months. Mr. Kelly also testified that his estimate for the costs of completing the interior of the store, what he called a "complete basic space" ready for business, prepared according to the "Melvin Simon basic" (according to Mr. Kelly, the "Melvin Simon basic" is a room with a floor, floor covering, sliding glass doors, a ceiling, light fixtures, air conditioning, toilet and a partition across the back) was $908.506. Objection by defendants' counsel that this amount was hypothetical and not based on actual replacement cost of actual improvements as of January 1, 1971, was sustained by the commission.

Hermel's next witness was B. W. Duck of B. W. Duck and Associates, who had been a principal witness for Hermel at the first hearing. He testified that his computation of the true value of the improvements based on the market data approach and the income capitalization approach had not changed since the first hearing. Mr. Duck testified that his computation of the value of improvements based on the replacement cost less depreciation approach had been changed because of the calculation of Pickens-Bond on the cost of completing the individual stores. The County objected to this testimony because it was based on the estimates of Mr. Kelly. The commission allowed the testimony for "what it may be worth". The revised figure for improvements was $8,374,676.25. This amount does not include $293,255 for grading and site work.

On cross-examination Mr. Duck testified that he did not include indirect costs in determining the replacement cost of the mall. This testimony corroborated that of Mr. Freed noted supra. Mr. Duck also tes-

tified that he did not know the actual cost of the interior improvements made by the various store owners. Finally, Mr. Duck testified that he relied most heavily on the income capitalization approach, then on the cost approach, and he gave little regard to the market data approach.

The County's evidence consisted of the depositions of the tenants and the testimony of Mr. Alva E. Koch and Mr. Joe E. Roberts.

The depositions of the tenants showed the total cost of leasehold improvements to be $2,521,889.52. Hermel objected to the depositions and to a compilation of the data contained in them on grounds that the totals contained amounts spent on personal property and that they were speculative.

Mr. Koch testified as an expert for Greene County. He testified that actual construction costs and indirect costs plus a 12.1% construction cost increase from April 1969 to January 1971 amounted to a replacement cost of $12,305,000 for improvements. The commission found the amount to be $12,705,821. Indirect costs included legal and title expenses involved in the title to the land and the preparation and negotiation of the leases. It also included certain interim expenses such as interim taxes, insurance and financing, and the administration cost involved in engaging architects, letting contracts, selecting tenants, etc. The percentage of 12.1 was added because the cost was figured as of April 1969 when the bid was let, and the valuation was to represent the cost as of January 1, 1971. Mr. Koch testified that construction costs increased by approximately 12.1% during the period between April 1969 and January 1, 1971. His original estimate of replacement cost was under $11,000,000 but this figure was updated to $12,305,000 to comport with the depositions introduced into evidence of the various tenants of the mall which showed that the tenants had spent greater sums than first estimated in converting their shells into ready-for-business stores. Mr. Koch also testified that the value of the improvements based on the income approach to be $12,205,000. This

figure included a sum for prepaid rent based on the large tenant improvements to the leasehold as shown by the depositions of the tenants, referred to supra.

Mr. Joe E. Roberts, who in 1969 was employed by New York Life Insurance Company, the lender for permanent loan of the Battlefield Mall, testified that he and another New York Life appraiser, F. H. Lehman, conducted an appraisal in 1969 of Battlefield Mall to determine value for loan purposes in order for New York Life Insurance Company to comply with the requirement of New York law prohibiting loans in excess of 75% of the true value of property. They arrived at cost figures by using the Marshall-Stevens Valuation Service cost per square foot and determined it to be $12,-175,000 for improvements. Mr. Roberts was later requested by Greene County to revise the appraisal as of January 1, 1971. Using the cost approach, he arrived at a value for improvements of $12,565,000. Mr. Roberts used the Elwood or mortgage-equity method to determine the value according to the income approach. The figure arrived at was $12,115,000 for improvements. This was revised to $12,665,000. Using the market approach, his total estimated value was $14,900,000 for land and improvements. The land value was not specified. Mr. Roberts concluded his testimony by stating that the income approach was the best approach under the circumstances and that his final estimated value was $14,300,000 for land and improvements, or $12,665,000 for the improvements alone.

In its "Conclusions of Law" following the second hearing, the commission found the assessor's valuation of improvements to be the true value. The commission stated that the assessor's valuation is presumed to be correct unless shown in some respect to be incorrect, citing *Foster Bros. Mfg. Co. v. State Tax Commission*, 319 S.W.2d 590 (Mo. 1958). As Hermel failed to overcome this presumption, the appraisal of the assessor must stand. This decision was grounded on Hermel's failure to produce any evidence showing the actual cost for construction and completion of the individual leasehold

improvements made by the tenants. Furthermore, the commission found the appraisals of Mr. Roberts and Mr. Koch supported the assessment of the assessor and showed it to be reasonable and proper and the appraisal of Mr. Duck to be less accurate because it did not include indirect costs, site improvements and inflationary factors in the cost approach or mortgage data in the income approach.

Hermel's contentions on appeal are: (1) that the presumption in favor of the assessor's valuation was rebutted because the decision of the commission after the first hearing is res judicata on that issue as sufficient evidence was introduced to rebut the presumption and favorable evidence introduced by the County showed the assessor's valuation to be grossly excessive; (2) that the decision of the commission was arbitrary and unreasonable and unsupported by competent and substantial evidence in that there was no new evidence at the 1975 hearing on the assessor's valuation which had been disallowed by the commission and the supreme court; the finding that Hermel's expert did not include indirect costs, site improvements, inflationary factors and mortgage data in his appraisal was decided with res judicata effect in 1971 in Hermel's favor and was contradicted by the evidence; and the evidence of improvements made by individual tenants included valuations for personal property; (3) the trial court substituted its discretion for the commission's when it found that Hermel failed to meet its burden.

■ On review of an administrative decision, this court is limited to a determination of whether the decision was supported by competent and substantial evidence upon the whole record, whether it was arbitrary, capricious or unreasonable, or whether the commission abused its discretion. *Greene County v. Hermel, Inc., supra,* at 768; sec. 536.140, RSMo 1969. The evidence must be considered in a light most favorable to the administrative body, together with all reasonable inferences which support it, and if the evidence would support either of two opposed findings, the reviewing court is bound by the administrative determination. *Board of Education, Mt. Vernon Schools, Mt. Vernon v. Shank,* 542 S.W.2d 779, 782 (Mo. banc 1976).

■ Hermel takes the position that the evidence of the assessor showing a valuation of $11,744,909 was considered and rejected by the commission in 1971 and that finding is res judicata as to that issue. Hermel asserts that the 1971 decision of the commission that Hermel rebutted the presumption in favor of the assessor's valuation and met its burden of proof must stand as a final determination on those issues. According to Hermel, this also means that there cannot be competent and substantial evidence to support the 1975 decision of the commission.

Hermel's reliance on res judicata is misplaced. The doctrine of res judicata is inapplicable here because this cause has not proceeded to a final judgment. See *Hickman v. Division of Employment Security,* 448 S.W.2d 270 (Mo.App.1969); *Noll v. Noll,* 286 S.W.2d 58 (Mo.App.1956), and *Smith v. Smith,* 176 S.W.2d 647 (Mo.App.1944). Section 536.140 gives a court on review the authority to reverse an agency's order and "order the reconsideration of the case in the light of the court's opinion and judgment and . . . order the agency to take such further action as it may be proper to require; . . ." In *Greene County v. Hermel, supra,* the court ordered the commission to reconsider its decision in light of its opinion, stating at 771: "On *another hearing* the finding should be more specific and, *if replacement cost is to be relied on,* Hermel should have further evidence, especially since the construction contract was obviously executed and the costs fixed as early as 1969. In any event, the Commission must arrive at the 'true value' or fair market value as of January 1, 1971, *by whatever method is followed.*" (emphasis supplied.) It is clear that a rehearing was required and that the commission was to consider all the evidence including the evidence introduced at the first hearing.

Although the court in *Greene County v. Hermel, supra,* held that the assessor's valu-

ation was not correct as a matter of law (511 S.W.2d at 768), this did not preclude the commission from concluding that it was the proper valuation. The commission had before it new evidence from other sources which showed the assessor's valuation to be reasonable and proper. That the evidence after the first hearing did not show the assessor's valuation to be correct as a matter of law does not rule out the possibility that there could be substantial evidence supporting the assessor's valuation. In such a case, where the evidence supports either of two findings, the reviewing court is bound by the determination of the agency. *Board of Education, Mt. Vernon Schools, supra,* at 782. Hermel's point based on the application of res judicata is overruled.

Hermel's attacks on the merits of the evidence are essentially ·that it overcame the presumption in favor of the assessor's valuation, that it met its burden of proof, and that the decision of the commission was unsupported by competent and substantial evidence on the record as a whole.

 A presumption exists in favor of the correctness of the valuation of the tax assessor. *Wymore v. Markway,* 338 Mo. 46, 89 S.W.2d 9, 14 (1935). In *Cupples Hesse Corporation v. State Tax Commission,* 329 S.W.2d 696, 702 (Mo.1959), it was held that to obliterate the presumption, "substantial controverting evidence" is required. Substantial evidence is "that evidence which, if true, 'has probative force upon the issues . . . ,' and from which the trier of fact can reasonably decide the case on the fact issues. . . ." The court went on to say, "[t]he evidence of petitioner here failed to show either discrimination or a valuation which was excessive . . . In such a situation, the presumption is not overcome." The initial question for this court is whether Hermel produced substantial evidence showing the assessment to be excessive.

Hermel produced evidence on the replacement cost, capitalization of income and market data approaches. As there was no evidence on the reliability of the market data approach, and substantial evidence

from all parties that it was generally unreliable because of the absence of similar property in the Springfield area, we will omit any further mention of it. Hermel's principal contention is that it submitted substantial evidence on the cost and income approaches.

As noted in the factual statement, Hermel's evidence on replacement value consisted of the cost of construction determined by the 1969 bids and an estimated value for tenant improvements. As noted by the commission, this replacement value did not include data such as indirect costs, site improvements, and inflationary factors. Hermel made no attempt to incorporate the depositions of the tenants as to leasehold improvements into its cost analyses. Although Hermel objected to the depositions because they included certain items arguably classified as personal property, the cost of these items as enumerated in Hermel's brief amounted to only $75,605.93. When subtracted from $2,521,889.52, the amount the depositions show as the leasehold improvements, this leaves a total for tenant improvements at $2,446,283.59. When added to the basic cost of $7,466,170.25 (as per Hermel's contracts) plus $293,255 for site work and $991,068 for indirect costs (site work and indirect expenses are factors which the commission could find relevant elements in determining the replacement costs, see *St. Louis County v. Security Bonhomme, Inc.,* 558 S.W.2d 655 (Mo. banc 1977), and *Stephen & Stephen Properties, Inc. v. State Tax Commission,* 499 S.W.2d 798 (Mo.1973)), the total cost comes to $11,-196,776.84 *without* adjustment for inflation. None of the valuations urged on this court by Hermel are within $1,500,000 of this figure. In view of the large figures under consideration and the replacement cost assessments of Mr. Roberts and Mr. Koch which exceeded the valuation of the assessor, the assessor's valuation of the improvements at $11,744,909 was not excessive.

 It should be further noted that Hermel tried to introduce an estimate by one of its contractors on the value of improvements but an objection to the evidence was

sustained and that ruling is not disputed here. Furthermore, a valuation made on construction costs alone is not based on competent and substantial evidence. *State ex rel. Kahler v. State Tax Commission*, 393 S.W.2d 460, 465 (Mo.1965). In *Greene County v. Hermel, supra*, at 771, the court said that the commission *could* adopt Hermel's construction cost figure as the replacement cost if adjusted to reflect the cost of tenants' additional improvements and the fact that the bid was let and costs fixed as early as 1969. This court holds that the replacement cost assessment of Hermel did not amount to substantial evidence.

Mr. Koch, Mr. Roberts, and Mr. Duck each testified that the preferred method of evaluating an income producing property was the income capitalization approach. Their results under this approach, however, were very different. Mr. Duck, who testified for Hermel, arrived at a valuation of $8,472,691. Mr. Koch's figure was $12,205,-000 and Mr. Roberts' was $12,665,000. Mr. Koch and Mr. Roberts both used the mortgage-equity approach to determine the capitalization rate. Mr. Duck, on the other hand, used the straight-line method which assumed a 100% ownership by the developer and assumed the property would not be sold for income tax purposes. Mr. Koch and Mr. Roberts testified that the straight-line method was not used by investment brokers currently, and Mr. Koch further testified that the straight-line method had not been favored since 1960 or 1965. The failure of Mr. Duck to include relevant mortgage data into his income approach prompted the commission to find his evidence "less accurate".

It is not within the purview of this court to ascertain the correct or modern means of determining the value according to the income capitalization approach just as it is not within the purview of this court to determine the method of valuation to be adopted by the commission. *Xerox Corporation v. State Tax Commission*, 529 S.W.2d 413 (Mo. banc 1975). It was within the administrative discretion of the commission to determine that the existing mortgage was a factor which should be considered in

fixing the "true value in money" under the income capitalization approach in this case. *St. Louis County v. Security Bonhomme, Inc., supra.*

For the foregoing reasons, we find the commission's conclusion that Hermel did not rebut the correctness of the assessor's valuation justified. As the presumption was not overcome, it is unnecessary for this court to determine if Hermel met its burden of proof. *Cupples Hesse Corporation, supra.*

■ The decision of the commission was supported by competent and substantial evidence on the record as a whole. The assessor's valuation was based in part on local costs and in part on use of the Kentucky Manual, a manual of average costs in Kentucky approximately ten years old at the time of the assessment, upgraded by 20%. Although the evidence on the means used to arrive at the 20% figure is lacking, there was evidence that inflation between 1969 and 1971 increased construction costs by over 12%, and in this light the 20% figure is not totally arbitrary and capricious. Furthermore, the valuations of Mr. Roberts and Mr. Koch using the income approach showed the assessor's valuation not to be excessive. The "true value" which the commission must find is at best a mere estimate (*Stein v. State Tax Commission*, 379 S.W.2d 495, 498 (Mo.1964)) and it is within the commission's discretion to adopt whichever approach it deems proper. *Xerox Corporation, supra.* The commission's decision that $11,744,909 represented the true value of improvements as of January 1, 1971, was supported by competent and substantial evidence on the record as a whole.

■ Hermel contends that the trial court substituted its discretion for that of the commission when it found that even if Hermel had rebutted the presumption in favor of the assessor's valuation, it did not meet its burden of proof. This contention is without merit. In the case of an affirmance of the agency's decision, nothing more is required than the rendition of the judg-

ment of affirmance. *Mobil Oil Corporation v. State Tax Commission,* 513 S.W.2d 319 (Mo.1974). In this instance, the circuit court affirmed the judgment and held that the decision of the commission was supported by competent and substantial evidence on the record as a whole, and in accepting the assessor's figures the commission was not acting arbitrarily, capriciously, unreasonably, nor in abuse of its discretion. This is within the scope of review afforded the circuit court by sec. 536.140. The fact that the circuit court went further to state that, even if Hermel rebutted the presumption, it did not meet its burden of proof is immaterial in the disposition of this case as we find the conclusion of the commission was not erroneous.

At the request of this court, both parties addressed the issue of the propriety of review by this court of cases involving the improper valuation of real estate. It is a fact that this court has reviewed cases of this type where the assessment of property is alleged to be arbitrary, capricious, unlawful or unfair. See, for example, *Sullivan County v. State Tax Commission,* 513 S.W.2d 452 (Mo.1974); *Stephen & Stephen Properties, Inc. v. State Tax Commission, supra; State ex rel. Kahler v. State Tax Commission, supra; Koplar v. State Tax Commission,* 321 S.W.2d 686 (Mo.1959), and *May Department Stores Co. v. State Tax Commission,* 308 S.W.2d 748 (Mo.1958). Moreover, this appeal emanates from the exact case previously appealed to this court and held by it to be within the jurisdiction of this court. *Greene County v. Hermel, supra.*

The rationale of these decisions and others like them is that an attack on the valuation on a piece of property involves a construction of a revenue law under art. 5, sec. 3, Mo.Const., namely, the construction of the words "true value" as found in sec. 137.115. See *Stephen & Stephen Properties, Inc. v. State Tax Commission, supra.* The question before us is whether or not these types of cases actually involve a construction of the words "true value" or merely an application of the meaning of the words to the facts of the case.

■ In *Dorrance v. Dorrance,* 242 Mo. 625, 148 S.W. 94, 98 (1912), it was held that construction " 'signifies determining the meaning and proper effect of language by a consideration of the subject-matter and attendant circumstances in connection with the words employed.' " See also *Ewing v. City of Springfield,* 449 S.W.2d 681 (Mo.App.1970). "True value" is an estimate of the fair market value on the valuation date. *Stein v. State Tax Commission, supra,* at 498; *Greene County v. Hermel, supra,* at 771. This definition has not changed from case to case. What does change are the methods used and the factors considered in determining "true value". The determination of which factors are relevant in a particular case and thus are required to be considered in determining true value has been held to involve the construction of a revenue law. *Stephen & Stephen Properties, Inc., supra.* The real question before the court in such a case is not the construction of the term "true value" but an *application* of this term to the facts of the case. Those facts will include the various methods of valuation and factors or data considered as a part of each method along with the results of the valuation. The meaning of the term "true value" is clear but its application to the facts in cases, such as the present one, is not so clear.

■ Because this court has accepted jurisdiction in this type of case in the past, and because this case has been decided by this court previously, we have decided the issues on the merits. In the future, however, cases questioning the value placed on a piece of property for tax purposes and challenging the valuation on the grounds that it is arbitrary and not supported by competent and substantial evidence shall not be considered within the exclusive jurisdiction of the supreme court because they do not involve a construction of the revenue laws of Missouri pursuant to art. 5, sec. 3, Mo.Const.

The judgment is affirmed.

All of the Judges concur.