**MISSOURI BAPTIST CHILDREN'S HOME, Appellant,**

**v.**

**STATE TAX COMMISSION OF MISSOURI, et al., Respondents.**

No. 76003.

Supreme Court of Missouri, En Banc.

Dec. 21, 1993.

Douglas A. Copeland, Stephen C. Hiotis, Clayton, for appellant.

John A. Ross, County Counselor, Dennis C. Affolter, Associate County Counselor, St. Louis County, Clayton, for respondents.

HOLSTEIN, Judge.

Plaintiff Missouri Baptist Children's Home (MBCH) owns commercial property in St. Louis County that has been leased as a K-Mart store since 1967. In 1989 the county assessor informed MBCH that the property's assessed valuation for that year would be $990,430.00, an increase of more than 100% over the previous assessed value. An initial appeal to the St. Louis County Board of Equalization was denied. § 138.180, RSMo Supp.1992. Review was sought before the State Tax Commission of Missouri (Commission), which ordered the assessment increased to $1,000,000.00. § 138.430.1, RSMo. Supp.1992.[1] Review was then sought in the circuit court. Following denial of relief in the circuit court and an appeal to the Court of Appeals, Eastern District, this Court granted transfer.

Commercial property must be assessed at 32% of its "true value in money." § 137.115.-5(1,), (3).[2] The preliminary issue is whether a below-market lease may be taken into consideration in determining the "true value in money" of the subject property. A second issue in this case is whether the Commission's analysis of the effect of the lease on the property's value is "supported by compe-tent and substantial evidence on the whole record." Mo. Const. art. V, § 18.

## FACTS

The MBCH property was leased to S.S. Kresge Company in 1967 and has been occupied as a K-Mart store since that time. The lease contains three five-year options following the initial twenty years. The lease was typical of those entered into in the late 1960's. At the time the tax was assessed in 1989, K-Mart was in the middle of the first option period.

MBCH receives rentals of $166,500.00 annually, plus 1% of the gross sales exceeding $6,720,000.00. As landlord, MBCH is responsible for upkeep of the building, parking lot, maintenance and insurance, and payment of utilities and taxes, including real estate taxes.

The only evidence as to value was the testimony of MBCH's expert, appraiser Tom McReynolds. Relying on three standard methods of valuing real property,[3] he estimated that the property's fee value, unencumbered by the lease, was $3,125,000.00. His income capitalization analysis ascribed rental value to the property of approximately $3.50 per square foot, based on current market rentals. However, the actual rent under the lease nets only about $1.00 per square foot. Using that rental to calculate the capitalized rental income, McReynolds concluded that the value of the property to MBCH was $1,092,000.00. He calculated this value by adding capitalized actual rental income to MBCH's reversionary interest in the property at the end of the lease period. His valuation assumed that the options would be renewed even though K-Mart was considering moving elsewhere. He testified that under present market conditions, the lease is highly favorable to K-Mart.

---

1. This statute authorizes taxpayer appeals to the Commission. Correction of assessments is authorized if the value is "unlawful, unfair, improper, arbitrary or capricious." Here there was no specific finding that the assessment fell into any of those categories. Nevertheless, the Commission increased the assessment.

2. All references to statutes are to RSMo 1986 unless otherwise noted.

3. The three methods are the cost method, income capitalization method and sales comparison method.

Gary Collins, the manager for MBCH, testified that while MBCH was not actively marketing the property, it had received two offers to purchase the property. One was made on the assumption that the buyer would assume the lease and was for $2,050,-000.00. The other offer, for $2,200,000.00, was made on the assumption that the lease would be terminated. There was no evidence that MBCH made a counteroffer or entered into further negotiations with either potential purchaser. Collins also testified that there had been rumors that K–Mart might leave, but K–Mart had indicated no interest in terminating the lease. Subject to certain exceptions, the lease permits K–Mart to assign its lease or sublet the property to others without MBCH's permission.

## I.

■ The position of the Commission on appeal is different from that reflected in the order of the hearing officer, which the Commission adopted as its own.[4] It is the Commission's contention now that the actual rental may not be considered a factor in determining value when relying on the income capitalization method of valuation. The hearing officer whose findings were adopted by the Commission relied in part on the income capitalization method to determine value. She concluded the K–Mart lease was a relevant factor to consider. The Commission now argues that such conclusion was mistaken.

■ True value in money is the price which the property would bring from a willing buyer when offered for sale by a willing seller. Thus, the true value is the fair market value of the property on the valuation date. *St. Joe Mineral Corp. v. State Tax Comm'n*, 854 S.W.2d 526, 529 (Mo.App.1993).

Although no Missouri case has specifically held what effect a below-market lease should have on an assessment, the subject property in *Stephen & Stephen Properties, Inc. v. State Tax Comm'n*, 499 S.W.2d 798 (Mo. 1973), was "encumbered by the existence of a ten year lease ... by which the income of the prospective buyer would be limited to the yearly rental payments." *Id.* at 803. This fact was held to be relevant to a determination of value. *Id.* at 804.

Although courts in other jurisdictions generally equate fair market value on the date of assessment with the true value, the cases are not in accord as to whether a long-term submarket lease may be factored into a determination of value under the income capitalization method. Those courts rejecting the actual rental as a factor in the income capitalization method of valuation base their decisions on two propositions. The first is that the potential income, not actual income, determines the highest and best use of the property. *Swan Lake Moulding Co. v. Dept. of Revenue*, 257 Or. 622, 480 P.2d 713, 714 (1971). The other proposition is that the tax must be assessed against all interests in the land to avoid an assessment below fair market value. *Schultz v. TM Florida–Ohio Realty Ltd. Partnership*, 577 So.2d 573, 575 (Fla.1991).

Other courts, while paying lip service to those propositions, have stopped short of saying that a below-market long-term lease may not be considered. For example, the Ohio Supreme Court held that the tax assessment board, faced with widely varying appraisals, could give more weight to the "economic rent" over "contract rent" in determining the true value in money of rental property subject to a below-market long-term lease. *Wynwood Apts., Inc. v. Board of Revision of Cuyahoga County*, 59 Ohio St.2d 34, 391 N.E.2d 346, 347–48 (1979). The court in that case noted that no "hard-and-fast rule" ignoring contract rent in favor of economic rent was adopted. *Id.*, 391 N.E.2d at 349.

The more recent and better-reasoned approach is to authorize the assessing authority to utilize actual as well as potential income in determining true value. *Denver v. Board of Assessment Appeals*, 848 P.2d 355, 361 (Colo. 1993); *Folsom v. County of Spokane*, 106 Wash.2d 760, 725 P.2d 987 (1986); *C.A.F. Investment Co. v. Michigan State Tax Comm'n*, 392 Mich. 442, 221 N.W.2d 588, 594–95 (1974). These cases take a realistic

---

**4.** It is debatable whether the Commission may attack the validity of its own conclusions of law on judicial appeal. That issue was not argued and is not decided.

approach to the economic conditions which cause property subject to long-term leases to have lower actual rentals than might be obtained if the property was unencumbered by the lease in the current market place. They note that it is often the long-term lease that gives value to property. The fact that a long-term lease is necessary to obtain long-term financing, which in turn makes possible the improvements, the fact that the lessor is a large nationally known retailer whose very presence improves rental value of nearby commercial property and the fact that prudent potential buyers would take the lease into consideration in determining what they are willing to pay are economic factors weighing in favor of giving consideration to actual rentals rather than relying solely on hypothetical value. A buyer interested in purchasing the unencumbered fee of property subject to a long-term below-market lease would recognize there are two, not one, persons to deal with and each has competing motivations for making any sale. This fact alone would have a chilling effect on potential purchasers.

By contrast, consideration of potential rent hypothesizes an unrealistic market. It assumes that properties now subject to long-term below-market leases are suddenly available to rent. That highly improbable situation would result in some marginally profitable tenants who benefit from such leases going out of business which, in turn, increases the number of commercial properties available for rent. Fundamental economic theory suggests that the greater the supply of rental property available and the lower the demand, rent necessarily will be lower than the current market rent. Wholly excluding below-market long-term leases from the equation assumes facts that do not and are unlikely ever to exist.

At the same time, projected actual income may be adjusted to reflect current market conditions where actual rent substantially distorts the property's true value. In fact, circumstances may exist where the income capitalization method is too vague or speculative to be a reliable measure of value. *C.A.F. Investment Co.*, 221 N.W.2d at 594–95. But to ignore actual rentals payable under a long-term lease when the lease was a prudent business transaction at the time it was entered into would have the effect not only of punishing the entrepreneur whose efforts created the environment for the market but would ignore economic realities. *Folsom*, 725 P.2d 987; *see also Caroldee Realty Corp. v. Bd. of Assessors*, 73 Misc.2d 41, 340 N.Y.S.2d 774, 780 (1972).

■ Placing a value on real property is not an exact science. When relying on the income capitalization method to determine value, the factfinder necessarily has some discretion to decide what weight will be given to actual rent, as opposed to potential market rent, in reaching its decision. Where the lease was prudent when entered into, the Commission is quite correct to consider actual rent as a factor in determining the value of the property under the income capitalization method.

■ The Commission argues that the uniformity clause of the Missouri Constitution prohibits an assessment based on a valuation which considers the effect of a below-market lease on the property. *Mo. Const. art. X, § 3.* In support of its argument the Commission cites *State ex rel. Cassilly v. Riney*, 576 S.W.2d 325 (Mo. banc 1979), and *Breckenridge Hotels Corp. v. Leachman*, 571 S.W.2d 251 (Mo. banc 1978). These cases hold that the assessor's practice of not updating assessments of older homes while assessing newly constructed residences violates the uniformity clause. Here, there is no question but that the assessments are updated. Merely because a factor exists which impacts on the value of one piece of property that does not affect every other piece of property in the same class is not a basis for violation of the uniformity clause. To reiterate, no error was committed in considering the actual rent as a factor.

II.

■ We now turn to the Commission's finding that the lease had no diminishing effect on the value of the property to determine whether that finding was supported by substantial and competent evidence.

The Commission accepted $3,125,000.00 as the value of the unencumbered fee, as testi-

fied to by McReynolds. The Commission also accepted that the rent paid under the lease was considerably below what the market would bring if the property was available for lease today. However, the Commission concluded that the below-market lease had no diminishing effect on this value. The basis for this conclusion was that "there is no evidence [other than McReynolds' opinion] that the lease will be renewed past a present option which has only a few years to run," and, "there is no reason that the present lease cannot be terminated upon the sale of the property." The Commission found fault with McReynolds' assumption that K–Mart will continue to lease the property until all options expire.

McReynolds testified that the fair market rental value of the building was $3.50 per square foot and "prudent management would demand that [K–Mart] continue to renew this lease." This was true whether K–Mart continued to do business at the site or not. Under this lease the tenant has the right to assign or sublet the premises. Thus, even if K–Mart would move its business to another location, it could legally sublet the property for as much as the market would bear, pay rentals of only $1.00 per square foot and pocket a profit. The real problem with the conclusion of the Commission is that it assumes that a business enterprise will freely surrender substantial economic benefits to which it is legally entitled. That conclusion is contrary to all logic. Thus, the Commission's finding that the property's value encumbered by the lease is the same as being unencumbered by the lease is not supported by substantial and competent evidence.

The judgment of the circuit court is reversed and the cause is remanded with directions that the circuit court remand the case to the Commission for a determination of the effect of the lease on the true value of the subject property based on the realistic economic assumption that the lessee will not give up its valuable economic interest in exercising the option to renew the lease.

All concur.