Bessie and William NANCE, Appellants,

v.

STATE TAX COMMISSION OF MISSOURI, Defendant,

Robert M. Boley, Director, Department of Assessment for Jackson County, Missouri, Respondent.

No. WD 55981.

Missouri Court of Appeals, Western District.

May 31, 2000.

William E. Quirk and Michael J. Elston, Kansas City, for Appellants.

Michael A. LeVota, Asst. County Counselor, Kansas City, for Respondent.

Before: HOWARD, P.J., and ULRICH and SMART, JJ.

VICTOR C. HOWARD, Presiding Judge.

William Nance [1] appeals from the circuit court's judgment affirming the State Tax Commission of Missouri's order concerning the valuation of property he owns.

Nance's sole point on appeal is that the trial court erred in affirming the Commission's order because the Commission's analysis of the market value of the Nance property was not supported by competent and substantial evidence in that 1) the credible evidence proved that, as a result of the long-term uneconomic lease encumbering the property, the leased fee was worthless, and 2) substantial and competent evidence indicated that based on actual rent received the leasehold was worth substantially less than the appraised value.

We affirm.

### Facts

On November 25, 1958, NACO Development Company, which was owned by the Nance family, leased a 6.3–acre piece of property commonly described as 8907 East U.S. 40 Highway in Jackson County, Missouri, for a 99–year term from the owners of the fee simple for an annual rental of $4,500. The fee simple owners were Luther Melcher, Price Williford, and Duran Sleyster ("the Melcher group"). One year later, NACO assigned the lease to "Forest and Bessie Nance, husband and wife, as tenants by the entirety, with rights of survivorship." The lease included an option for the lessee or its assignees to purchase the property from the Melcher group for $62,500.

In 1962, D & L Development Company subleased the property from the Nances for the remainder of the term of the original lease at a rate of $800 per month. Under the terms of the sublease, the Nances are responsible for property taxes on the unimproved property, while D & L pays the property taxes resulting from any improvements on the property. When the Nances first subleased the property, the total property taxes amounted to approximately $300 per year.

In 1970, the Nances exercised their option to purchase the property for $62,500.

---

1. Bessie Nance was the record holder of the property for the tax years at issue. Mrs. Nance died in 1994, and William Nance has been substituted by agreement of the parties.

The Nances obtained title to the property in 1971. Bessie Nance became the sole owner of the property when her husband died. In 1982, Mrs. Nance conveyed the property to her son, William L. Nance. The 1982 deed was not recorded until October 3, 1994, shortly before Mrs. Nance died.

D & L never made any significant improvements to the property and currently rents the property to third parties on a month-to-month basis. By 1992, real estate taxes on the property had escalated to $9,000 per year because the tax assessor set the market value at $283,000. The assessor's calculation of fair market value was based on the assumption that the fee was unencumbered and owned by Mrs. Nance as a fee simple.

Mrs. Nance, then still the record owner of the property, applied for review of the valuation of the property in the State Tax Commission. She also sought review of her 1994 property taxes, which were based on a market value of $292,437. The market valuations for both tax years are now before this court.

The State Tax Commission initially rejected Nance's application for review. Mr. Nance appealed to the Circuit Court of Jackson County. By agreement of the parties, the case was remanded to the Commission for a second evidentiary hearing. The Commission adjusted the valuations for both 1992 and 1994 in light of the Missouri Supreme Court's decision in *Missouri Baptist Children's Home v. State Tax Comm'n*, 867 S.W.2d 510 (Mo. banc 1993) ("*MBCH*"). In short, the Commission concluded that the lease created two property interests: the leasehold, owned by D & L, and the leased fee, owned by Mr. Nance. Each interest is subject to property tax under § 137.115.1 RSMo 1994.[2] Thus, the fair market value for property tax purposes, according to the Commission, is the sum of the separately valued interests created by the long-term lease. The Commission held that the difference between the fair market value of the unencumbered fee simple and the sum of the values of the leased fee and the leasehold was the impact of the lease on the value of the property.

This appeal does not challenge the Commission's methodology; rather, this appeal is premised on errors made in valuing the two separate interests – Mr. Nance's leased fee and D & L's leasehold – that make up the fair market value of the property adjusted for the impact of the long-term lease.

### Evidence regarding the negotiation of the 1962 lease

During the second hearing before the Commission, Mr. Nance testified that he was instrumental in negotiating the initial lease for his parents in 1958 and the sublease to D & L in 1962.[3] He also testified that in 1962 he believed that the sublease arrangement was not only prudent, but was a "winner," because his parents would receive $9,600 in rent annually on a piece of land they were renting for $4,500 per year and that would cost them $62,500 to purchase under the 1958 lease. He also testified that the sublease did not require D & L to pay property taxes on the unimproved land because the value of the underlying land, and thus the amount of property taxes owed on an annual basis, was "pretty stable." Both before and after the 1962 D & L lease, the Nances were required to pay the property taxes, and Mr. Nance was not "aware of any significant or material changes in taxes" that caused him concern about that requirement.

Robert J. Chapman, Appellant's expert, testified that the 1962 lease was prudent despite its 95–year term and the fact that property taxes were not passed on to the

2. All statutory references are to RSMo 1994.

3. Mr. Nance inaccurately recalled that his parents took title to the property prior to

entering into the D & L sublease. In fact, they did not exercise their option to purchase the property until eight years after the sublease was entered into.

tenant. He stated that in his opinion the lease was prudent because the income stream over ten years would exceed the option price by more than $30,000. Mr. Chapman testified that only since 1980 has it been common practice to include tax-escalation clauses in long-term leases.

No evidence was presented that the duration of the D & L lease was typical of leases entered into in the early 1960s. Nor was there evidence of any other such leases executed in the late 1960s or evidence showing the necessity of a 95–year lease to enable D & L to obtain long-term financing to make improvements possible.

### Evidence regarding the value of the property for the 1992 tax year

Respondent's expert, Lynn Michaelson, submitted a report valuing the leased fee at $81,500, the leasehold at $132,000, and the property unencumbered at $283,000 as of January 1, 1992. The report is an addendum to the appraisal he prepared while employed in the county's assessment department, which was introduced as Exhibit B in the first hearing.

Mr. Michaelson's appraisal of the leased fee was based solely on the income approach, but using actual rental income received capitalized at a rate of 11.17%. Mr. Michaelson assigned no value to Mr. Nance's right of reversion, which probably will not occur until 2057. The appraisal did not consider the effect of the lease's property tax provision on the income stream. Unlike the appraisal on the leased fee, the appraisal of the leasehold considered a hypothetical market rental rate rather than the actual rent D & L receives from its tenants.

Under cross-examination, Mr. Michaelson reiterated his opinion that the 1992 fair market value of Mr. Nance's leased fee is $81,500. He testified that Mr. Nance could find a buyer for the leased fee for $81,500 with a $600 annual income stream, which amounts to a return on the hypothetical buyer's investment of less than one percent. Mr. Michaelson also testified that the value of the leased fee would

likely go down as time passes. Therefore, not only would the hypothetical buyer receive a return on his investment of less than one percent, but he would have to sell the leased fee at a loss (at least in the short term, while the landlord's reversionary interest in 2057 is worthless). Nonetheless, the Commission concluded that the fair market value of Mr. Nance's property for the 1992 tax year was $213,000 – Mr. Michaelson's appraisal of the leased fee added to his appraisal of the leasehold.

At the hearing, Mr. Nance testified that no one would buy the leased fee for an income stream that was approximately $600 per year after taxes and declining with each increase in the assessed value.

### Evidence regarding the value of the property for the 1994 tax year

The parties stipulated that the testimony of Mr. Nance and Mr. Chapman regarding the 1992 tax year would be admissible on the 1994 tax year as well.

With respect to the 1994 valuation, Mark E. Boettcher, a land appraiser with the Kansas City firm of Bliss Associates, Inc., testified that given the current tax burden, while "it would seem unlikely to me that a typical buyer would have any interest in ... buying the property," the leased fee's fair market value based on the income approach is $65,000 before the impact of property taxes is considered. When the tax burden is considered, the leased fee is worthless.

Steve Kennicutt, an appraiser with Jackson County, submitted his report, which indicated that the fair market value of the property was $300,000, while the leased fee was worth $90,000 and the leasehold was worth $136,000 as of January 1, 1993. At the hearing, he admitted that in making his valuations, he had incorrectly assumed that the property had public sewers. He also agreed that his $90,000 valuation of Mr. Nance's interest in the property does not consider the current tax burden and that the leased fee is worthless when those taxes are factored in.

Mr. Kennicutt also stated that his valuation was based on annual income of $30,000, while D & L's annual income is closer to $13,800 per year, or only 46% of the hypothetical market rent assumed by Mr. Kennicutt's appraisal. Mr. Kennicutt used the higher annual income in his valuation because he found that the current rental rates are "below market." Additionally, like Mr. Michaelson, Mr. Kennicutt did not use the actual rent received by D & L to value the leasehold.

The Commission added Mr. Kennicutt's appraisals of the leased fee and the leasehold together and set the fair market value of Mr. Nance's property at $226,000.

On appeal to the Jackson County Circuit Court, Mr. Nance argued that the total fair market value of the property based on the income approach and using the actual rental income was only $65,000. The circuit court adopted the Commission's findings of fact and affirmed the Commission's determinations of true value. The court concluded that fair market value of the property was the sum of the value of the leased fee and the value of the leasehold. The court adopted the Commission's findings on those values without any analysis and concluded that they were supported by competent and substantial evidence. This appeal followed.

### Standard of Review

 On appeal from a circuit court's review of an administrative decision, we review the decision of the administrative agency, not the judgment of the circuit court. *Evangelical Retirement Homes of Greater St. Louis, Inc. v. State Tax Comm'n of Missouri*, 669 S.W.2d 548, 552. (Mo. banc 1984). On review of an administrative decision, this court is limited to a determination of whether the decision was supported by competent and substantial evidence upon the whole record, whether it was arbitrary, capricious or unreasonable, or whether the commission abused its discretion. *Hermel, Inc. v. State Tax Comm'n*, 564 S.W.2d 888, 894 (Mo. banc 1978). "A presumption exists in favor of the correctness of the valuation of the tax

assessor." *Id.* at 895. To rebut the presumption, Appellant must produce "substantial controverting evidence" showing the assessment to be excessive. *Id.*

 The courts may not assess property for tax purposes. *Savage v. State Tax Comm'n of Missouri*, 722 S.W.2d 72, 75 (Mo. banc 1986). Proper methods of valuation and assessment of property are delegated to the Commission, and on review, the evidence must be considered in the light most favorable to the administrative body, together with all reasonable inferences which support it. *Id.; see also Hermel, Inc.*, 564 S.W.2d at 896 (finding that "it is not within the purview of this court to determine the method of valuation to be adopted by the [C]ommission"). If the evidence would support either of two opposed findings, the reviewing court is bound by the administrative determination. *Id.* The Commission is the judge of the credibility of the witnesses and of the evidence. *Equitable Life Assur. Soc'y of U.S./Marriott Hotels, Inc. v. State Tax Comm'n of Missouri*, 852 S.W.2d 376, 380 (Mo.App. E.D.1993).

### Argument

The sole point on appeal is that the trial court erred in affirming the State Tax Commission's order because the Commission's analysis of the market value of the Nance property was not supported by competent and substantial evidence in that 1) the credible evidence proved that, as a result of the long-term uneconomic lease encumbering the property, the leased fee was worthless, and 2) substantial and competent evidence indicated that based on actual rent received the leasehold was worth substantially less than the appraised value.

We reiterate that this appeal does not challenge the Commission's methodology in finding that the difference between the fair market value of the unencumbered fee simple and the sum of the values of the leased fee and the leasehold is the impact of the lease on the value of the property.

Rather, the appeal challenges the methodology used to value the two separate interests – the leased fee and the leasehold – that make up the fair market value of the property adjusted for the impact of the long-term lease.

■ Section 137.115.1 provides, in relevant part, that "[t]he assessor shall annually assess all real property ... and possessory interests in real property at the percent of its true value in money...." "True value in money is the price which the property would bring from a willing buyer when offered for sale by a willing seller. Thus, the true value is the fair market value of the property on the valuation date." *MBCH*, 867 S.W.2d at 512.

### Valuation of Leased Fee

■ Appellant contends that the true value of land or an interest in land is the fair market value, and the effect of a long-term lease on that value must be considered by the Commission. Appellant contends that evidence in this case proved that as a result of the long-term lease encumbering the property, the leased fee was worthless.

Mr. Boettcher, Appellant's expert, used the income approach[4] to value the property. He applied the 14% to 16% yield rate to the property's $9,600 annual income, suggesting a value of $60,000 to $68,000, which is what Mr. Boettcher testified a knowledgeable and willing buyer would likely pay for the leased fee interest. Mr. Boettcher testified that he was not able to quantify the effect of the long-term lease on the property value. However, he testified that in his opinion a buyer would pay less for the property because of the unfavorable lease.

Mr. Michaelson, Respondent's expert, used the cost approach[5] to determine the site value, but used the income approach to value the leased fee interest. He testified that the market value for the leased fee interest for the 1992 tax year was $81,500. Mr. Michaelson capitalized the contract rent using an 8% interest rate and an effective tax rate of 3.17% for an overall rate of 11.17%. Mr. Michaelson also considered the reversion value, but found that the lack of growth in the area indicated a reversion of less than two-tenths of one percent.

Mr. Kennicutt, Respondent's expert, also used the cost approach to determine the site value, but used the income approach to value the leased fee. In determining the value of the leased fee interest, Mr. Kennicutt capitalized the contract rent, less expenses, using a 7% interest rate and an effective tax rate of 3.15% for an overall rate of 10.15%. The resulting value was $89,852, which he rounded to $90,000.

Appellant relies heavily on *Missouri Baptist Children's Home v. State Tax Commission*, 867 S.W.2d 510 (Mo. banc 1993), in support of his point. Therefore, we initially discuss the facts and holdings of that case. In *MBCH*, Missouri Baptist Children's Home appealed the valuation of a piece of property it owned, which was subject to a long-term lease to S.S. Kresge Company (K–Mart). *MBCH*, 867 S.W.2d at 511. The issue was whether a long-term sub-market lease may be factored into a determination of the "true value in

---

4. The income capitalization approach evaluates what a willing buyer would pay to realize the income stream that could be obtained from the property when devoted to its highest and best use. "Under this method, the Commission must project the net income stream that could reasonably be anticipated by an investor/purchaser, discounting future dollars to present levels in order to compensate for risk and the elapsed time required to recapture the initial investment." *Equitable Life*

*Assur. Soc'y of U.S./Marriott Hotels, Inc.*, 852 S.W.2d at 380.

5. The cost approach evaluates the value of the land (in this case determined by comparison to similar properties), adds the value of replacement costs of improvements, and subtracts from that sum the value of depreciation of the improvements. *Aspenhof Corp. v. State Tax Comm'n of Missouri*, 789 S.W.2d 867, 869 (Mo.App. E.D.1990).

money" of the subject property. *Id.* The court held that the assessing authority may "utilize actual as well as potential income in determining true value." *Id.* at 512. The court found that the out-of-jurisdiction cases supporting this method for determining property value "take a realistic approach to the economic conditions which cause property subject to long-term leases to have lower actual rentals than might be obtained if the property was unencumbered by the lease in the current market place." *Id.* at 512–13. The court found that the cases noted "that it is often the long-term lease that gives value to property." *Id.* at 513. The court went on to state that

[t]he fact that a long-term lease is necessary to obtain long-term financing, which in turn makes possible the improvements, the fact that the lessor is a large nationally known retailer whose very presence improves rental value of nearby commercial property and the fact that prudent potential buyers would take the lease into consideration in determining what they are willing to pay are economic factors weighing in favor of giving consideration to actual rentals rather than relying solely on hypothetical value.

*Id.* The court held that "[b]y contrast, consideration of potential rent hypothesizes an unrealistic market. It assumes that properties now subject to long-term below-market leases are suddenly available to rent." *Id.* The court found that

[w]holly excluding below-market long-term leases from the equation assumes facts that do not and are unlikely ever to exist. At the same time, projected actual income may be adjusted to reflect current market conditions where actual rent substantially distorts the property's true value. In fact, circumstances may exist where the income capitalization method is too vague or speculative to be a reliable measure of value. But to ignore actual rentals payable under a long-term lease when the lease was a prudent business transaction at the time it was entered into would have the effect

not only of punishing the entrepreneur whose efforts created the environment for the market but would ignore economic realities.

*Id.* (Citation omitted.) The court concluded that

[p]lacing a value on real property is not an exact science. When relying on the income capitalization method to determine value, the factfinder necessarily has some discretion to decide what weight will be given to actual rent, as opposed to potential market rent, in reaching its decision. Where the lease was prudent when entered into, the Commission is quite correct to consider actual rent as a factor in determining the value of the property under the income capitalization method.

*Id.*

■ It is clear that the Commission was required to consider the effect of the long-term lease on the value of the property in this case. In *MBCH*, 867 S.W.2d at 513, the court found that "[w]holly excluding below-market long-term leases from the [valuation] equation assumes facts that do not and are unlikely ever to exist." It is also clear that the Commission did take into account the effect of the long-term lease on the value of the property. The Commission found that "[a] long-term lease is a relevant factor to consider when determining value," and recognized that "the existence of the leasehold has a chilling effect on the value of the property."

Citing *MBCH*, the Commission found that it may look at contract rent in conjunction with economic rent if a long-term lease was prudent when entered into. The Commission found that under the supreme court's analysis in *MBCH*, a prudent lease is one that gives the property value. The Commission found that the factors present in *MBCH* (i.e., the long-term lease was necessary to obtain long-term financing which made improvements possible, and/or the leaseholder was a large, nationally known retailer whose presence enhances nearby property values) are not present in

the case at bar. The Commission found that the lease was not prudent when entered into for four reasons. First, the Commission found that the testimony that the lease was prudent because it was returning in excess of ten percent per year on the $6,700 investment was without merit because 1) the evidence showed that the Nances did not even purchase the property until eight years after they sublet it to D & L, and 2) they were never under any obligation to purchase the property, so "return on investment" was not a verifiable motive. Second, the Commission found that "the very concept of a prudent lease requires the exercise of sound, cautious judgment," and there was no credible evidence that would suggest that it was sound business judgment to tie up land for 95 years and to bear the tax burden on that land with no anticipation of significant improvement by a significant leaseholder. Third, the Commission found that Appellant's argument that the lease was prudent because the ground value "looked pretty stable" was not persuasive. The Commission cited the fact that NACO or the Nances paid $4,500 per year rent and $300 per year taxes for the property in 1958, and in just over three years they were able to sublet the property for $9,600 per year, an increase of over 100 percent. The Commission found that such an increase in value in such a short period of time suggested that the Nances' belief that the ground value was "pretty stable" was "extremely poor business judgment," and therefore the lease could not be characterized as prudent. Fourth, the Commission found that, unlike in *MBCH,* the evidence did not support a finding that the 95–year D & L lease was typical of leases entered into in the early 1960s.

The Commission found that even though the D & L lease was not prudent, it could be considered if the evidence suggested that a prudent potential purchaser would take the lease into consideration when determining what he was willing to pay for the property. The Commission found that both of Respondent's experts found that the sum of the leased fee value and the leasehold value was less than the fee simple value, and at least some portion of the difference was attributed to the effect of the long-term lease. Because the Commission found that a prudent buyer would pay no more for the property than what he would have to pay for its parts, the buyer would attempt to purchase each part separately. Therefore, the Commission found that true value in money for the subject property was $213,500 for 1992 and $226,000 for 1994.

The Commission stated that projected actual income may be adjusted to reflect current market conditions where actual rent substantially distorts the property's true value. The Commission found that "[t]he contract rent for the subject property substantially distorts its market value." The Commission stated as follows:

[Appellant] argues that under the language of *Missouri Baptist* ... the property cannot have a value in excess of the capitalized value of the contract rent. Such a mandate cannot be found in *Missouri Baptist.* To the contrary, the Supreme Court stated that the income capitalization method may be too speculative to be a reliable measure of value when actual rent substantially distorts the property's true value.... This case is a perfect example of the exception the Supreme Court was addressing. The only evidence on the record indicates that the unencumbered fee simple value for the property was $283,000 in 1992 and $300,000 in 1994. The leasehold alone was valued between $132,000 and $136,000. However, under [Appellant's] argument, the property would have a value of no more than $90,000, the highest value proposed for the leased fee based on its income stream. The market value of the property must be at least equal to the market value of the ownership interests involved. Clearly, a value based solely on the actual rent substantially distorts the property's total market value and therefore, cannot

be a reliable indicator of that total value.

Appellant contends that the Commission's finding that the fair market value of the leased fee was $81,500 and $90,000 for the tax years at issue is not supported by competent and substantial evidence in the record because all experts except Mr. Michaelson agreed that, considering the terms of the long-term lease encumbering the property, the fair market value of the leased fee was zero. Appellant argues that Mr. Michaelson's testimony about the value of the leased fee was inherently unreliable because it was based on the unrealistic assumption that a buyer would invest $81,500 for, at best, an annual return of less than one percent over sixty years, assuming taxes do not rise over that period.

Appellant may be correct in asserting that nobody would purchase the leased fee at its present terms considering the tax burden. However, assessing the value of the leased fee interest in this case as zero would go against public policy. As Respondent points out, if a property owner could unilaterally alienate his property by lease or by other actions that make the property have no value to him, the taxing authority could not collect appropriate property tax because of the taxpayer's unilateral action. If the property were not valued and assessed as unencumbered by the lease, the taxpayer appears to be afforded a tax cut because of the poor judgment of his predecessors.

### Valuation of Leasehold

■ Appellant contends that the Commission compounded its error by relying on erroneous appraisals of the leasehold based on unsubstantiated, hypothetical market rent rather than the actual contract rent received by D & L, as required, with limited exceptions not applicable here, by *Missouri Baptist Children's Home v. State Tax Comm'n of Missouri*, 867 S.W.2d 510 (Mo. banc 1993).

Concerning the valuation of the leasehold for the 1992 tax year, the Commission noted the following in its decision:

> To determine the leasehold value, Mr. Michaelson first determined the fee simple value from comparable sales and deducted the cost of demolition ($283,000). He then developed market land rent ($28,300) by using a typical capitalization rate for this type of property (10%). Mr. Michaelson testified that he could not develop a capitalization rate from similarly leased properties because there were none so he was forced to develop his capitalization rate from what he thought the fee simple value of the property should be. Finally, he subtracted the actual rent ($9,600) from the market rent ($23,800) to determine the benefit to the leaseholder ($18,700). Because the leasehold is subject to fluctuations in the real estate market and changes in the surrounding neighborhood, Mr. Michaelson determined that it was more volatile and had a higher degree of risk than the leased fee estate. Therefore he capitalized the benefit to the tenant at 11% rather than 8% assigned to the leased fee. A 3.17% effective tax rate was added for an overall rate of 14.17% indicating a value of $132,000.

In regard to the valuation of the leasehold for the 1994 tax year, the Commission noted as follows:

> To determine the leasehold value, Mr. Kennicutt first determined the fee simple value from comparable sales ($300,-000). He then developed market land rent ($30,000) by using a typical capitalization rate for this type of property (10%). Finally, he subtracted the actual rent plus expenses ($10,700) from the market rent ($30,000) to determine the benefit to the leaseholder ($19,300). Because the leasehold is subject to fluctuations in the real estate market and changes in the surrounding neighborhood, Mr. Kennicutt determined that it was more volatile and had a higher degree of risk than the leased fee estate. Therefore, he capitalized the benefit to

the tenant at 11% rather than 7% assigned to the leased fee. A 3.15% effective tax rate was added for an overall rate of 14.15% indicating a value of $136,000.

The Commission's summaries of the appraisers' valuations are supported by the record. In valuing the leasehold, both Mr. Michaelson and Mr. Kennicutt used the income capitalization method, an approved method for valuing leaseholds. *Equitable Life Assurance Soc'y of U.S./Marriott Hotels, Inc.*, 852 S.W.2d at 378. Contrary to Appellant's contention, we do not find anything in *MBCH* that stands for the proposition that when valuing a leasehold, fair market value is established solely by actual rent received. To the contrary, the court in *MBCH* specifically held that "projected actual income may be adjusted to reflect current market conditions where actual rent substantially distorts the property's true value." *MBCH*, 867 S.W.2d at 513. The evidence in this case supports the finding that the actual income D & L was receiving under its lease substantially distorted the leasehold's true value. Therefore, we conclude that nothing in *MBCH* affects the validity of the method used by Mr. Michaelson and Mr. Kennicutt to determine the value of the leasehold.

Moreover, the Commission found that "[i]n a case alleging overvaluation, [Appellant] must not only present evidence which overcomes the presumption in favor of the Board of Equalization, but must also present substantial and persuasive evidence showing that the value which he proposes is correct." Appellant's expert made no attempt to value the leasehold in this case. Therefore, the Commission may not be charged with error in accepting Respondent's valuations of the leasehold. *See Hercules, Inc. v. State Tax Comm'n of Missouri*, 787 S.W.2d 739, 742 (Mo.App. E.D.1989) (affirming the Commission's valuation on the basis that the appellants failed to prove a lesser true value in money of the assessed property).

To limit the value of the property to the value of the leased fee would ignore the value of the leasehold interest. Under § 137.115, the assessor is required to assess all real property and possessory interests in real property. To be sure, the long-term lease must be factored into valuation, and it was in this instance. Both of Respondent's experts found that the sum of the leased fee value and the leasehold value was less than the fee simple value. Appropriately, at least some portion of the difference was attributed to the effect of the long-term lease.

### Availability of Sewers

Appellant further argues that the Commission's entire valuation for the 1994 tax year is tainted by Mr. Kennicutt's admission that he incorrectly assumed that Appellant's property had public sewers. Thus, Appellant argues, the appraisal does not constitute competent and substantial evidence, and the Commission should not have relied on the appraisal.

Mr. Kennicutt stated at the hearing that he did not determine that the property did not have sewers until after he made his appraisal report. Therefore, his report did not include an adjustment for the fact that the property did not have sewers. However, all of Mr. Kennicutt's comparables had either no sewers or inconvenient access to sewers. The Commission found that "[l]ack of immediate access to sewers has some impact on property value. With no testimony from Complainant on the cost to cure this deficiency, the comparables presented by Mr. Kennicutt are the best indicators of market reaction to parcels with no sewers or inconvenient access." We agree with the Commission's finding, and we find that the Commission did not err in relying on Mr. Kennicutt's valuation.

The judgment of the circuit court is affirmed.

ULRICH and SMART, JJ., concur.