EQUITABLE LIFE ASSURANCE SOCI-
ETY OF the UNITED STATES/MAR-
RIOTT HOTELS, INC., Appel-
lant/Cross Respondent,

v.

STATE TAX COMMISSION
OF MISSOURI, et al.,

Kenneth D. MORTON, Assessor for
St. Louis County, Missouri, Re-
spondent/Cross Appellant,

v.

STATE TAX COMMISSION OF
MISSOURI, et al., Defen-
dants/Respondents.

Nos. 62286 & 61574.

Missouri Court of Appeals,
Eastern District,
Division Four.

April 20, 1993.

Motions for Rehearing and/or Transfer to
Supreme Court Denied May 18, 1993.

Jerome Wallach, Cathy Steele, St. Louis, for appellant/cross-respondent.

Dennis C. Affolter, Clayton, for respondent/cross appellant.

Richard L. Wieler, Jefferson City, for defendants/respondents.

CRAHAN, Judge.

These are consolidated appeals from separate decisions of the State Tax Commission of Missouri ("Commission") relating to the valuation and assessment of real property located in St. Louis County, Missouri, commonly known as the St. Louis Marriott Hotel ("the property") for the year 1984.[1] Kenneth D. Morton, St. Louis County Assessor ("Assessor") appeals from the Commission's valuation of the property, contending that the Commission's use of a gross income figure from a "discredited appraisal" rendered its valuation based on the income capitalization approach arbitrary and unsupported by competent and substantial evidence. Equitable Life Assurance Society of the United States/Marriott Hotels, Inc. ("Taxpayer") appeals the ratio applied by the Commission for equalization of the assessment. Specifically,

---

1. We need not recount in detail the lengthy procedural history which delayed appellate disposition of a 1984 tax assessment until 1993. We note, however, that the cases did not reach this Court until 1992. Briefing was not completed until late 1992 and oral argument and final submission occurred on January 20, 1993.

Taxpayer maintains that the Commission erred in applying the arithmetic mean instead of the median ratio derived from the Commission's annual ratio study to satisfy the requirements of Article X, Section 3 of the Missouri Constitution for uniformity of taxation upon the same class of property within each taxing jurisdiction. We affirm the decisions of the Commission in both appeals.

The parties agree that Assessor's appeal does not require construction of the revenue laws but only the valuation placed upon specific property, thereby vesting this Court with jurisdiction pursuant to Mo. Const. art. V, § 3 (1945). *See Hermel, Inc. v. State Tax Commission,* 564 S.W.2d 888, 897 (Mo. banc 1978). Relying on the same constitutional provision, Taxpayer originally filed its appeal in the Missouri Supreme Court, alleging that construction of the revenue laws was required. The Missouri Supreme Court transferred Taxpayer's appeal to this Court and the appeals were consolidated. Under such circumstances, we are required to examine the jurisdictional issue anew and to retransfer the appeal if jurisdiction is lacking. *Collector of Revenue v. Parcels of Land,* 566 S.W.2d 475, 476 (Mo. banc 1978); *State v. Woods,* 645 S.W.2d 745, 746 (Mo.App.1983) (en banc). Because the analysis of this issue is intertwined with our analysis of the precise issue presented by Taxpayer's appeal, we will consider those issues together after considering the merits of Assessor's appeal.

The property in question contains approximately 12.15 acres, zoned commercial, and is improved by a 604 room hotel consisting of six interconnecting buildings, five of which were constructed in 1972 and one of which was constructed in 1981. The improvements include various restaurant and banquet facilities, tennis courts, swimming pools and concrete and asphalt driveways and parking areas.

The neighborhood in which the property is located is strongly influenced by Lambert St. Louis Airport, situated directly to the north. The area contains one of the largest concentrations of transient hotel facilities in the area, including over 4,000 hotel rooms. Adjoining properties include another hotel, a car rental agency, long-term airport parking and the airport entrance itself. The property is directly accessible from Interstate 70 and locally accessible from Interstates 270 and 170.

The property is owned by Equitable Life Assurance Society of the U.S. and is leased to Marriott Hotels, Inc. The original term of the lease is twenty-five years, renewable at lessee's option for five ten-year periods on the same terms and conditions.

The parties agreed and the Commission found that the highest and best use of the property was as improved for hotel use. Assessor valued the property on the general assessment rolls as of January 1, 1984 at $3,946,180. Taxpayer appealed that assessment to the County Board of Equalization which ordered the assessed value reduced to $3,775,000. Taxpayer then sought review of this assessment by the Commission. Following an evidentiary hearing, the Commission determined that the assessed value of the property should be further reduced to $3,443,000.

In support of its determination, the Commission issued extensive findings of fact and conclusions of law evaluating the property according to the three accepted methods for determining the property's true value in money: income capitalization, sales comparison and replacement cost less depreciation. There is no dispute that the Commission properly determined that the income capitalization approach was most reflective of market value in this instance, which was also the method ultimately relied upon by Assessor's and Taxpayer's experts. However, in calculating the market value of the property according to the income capitalization method, the Commission found that neither party presented an appraisal that could be accepted in its entirety. Instead, the Commission recalculated the market value based on facts contained in the analyses presented by each of the parties' experts. Based on these calculations, the Commission determined the true value of the property on January 1, 1984 to be $21,385,000. The Commission further found that application of the consti-

tutionally-mandated assessment ratio of thirty-three and one-third percent would result in assessment of the property at a greater percentage of true value than other property, generally, of the same class within the taxing jurisdiction. Specifically, based on official notice of its assessment ratio study for St. Louis County for the 1984 tax year and the testimony of Mr. James Follina, Manager of Ratio Study for the Commission, the Commission determined that the average assessment ratio for St. Louis County for the tax year 1984 was 16.1 percent (rounded). Applying this ratio to the Commission's calculated market value of $21,385,000, the Commission found the proper assessed value of the subject property on January 1, 1984 to be $3,443,000.

### Assessor's Appeal—Valuation Of The Property

■ The principles which constrain our review of the Commission's actions in assessing property for tax purposes were succinctly summarized in *Savage v. State Tax Comm'n of Missouri*, 722 S.W.2d 72, 74–75 (Mo. banc 1986):

Our review of the Commission's decision is ordinarily limited to whether that decision is "supported by competent and substantial evidence upon the whole record or whether it was arbitrary, capricious, unreasonable, unlawful or in excess of its jurisdiction." *Evangelical Retirement Homes of Greater St. Louis, Inc. v. State Tax Commission*, 669 S.W.2d 548, 552 (Mo. banc 1984); § 536.140.2, RSMo 1978. In matters of property tax assessment, this Court has acknowledged "the wisdom of the General Assembly in providing an administrative agency to deal with this specialized field." *State ex rel. Cassilly v. Riney*, 576 S.W.2d 325, 328 (Mo. banc 1979). Thus, we recognize that the courts may not assess property for tax purposes, *Drey v. State Tax Commission*, 345 S.W.2d 228, 238–9 (Mo. 1961), that proper methods of evaluation and assessment of property are delegated to the Commission, *C & D Investment Co. v. Bestor*, 624 S.W.2d 835, 838 (Mo. banc 1981) and that on review, "[t]he

evidence must be considered in the light most favorable to the administrative body, together with all reasonable inferences which support it, and if the evidence would support either of two opposed findings, the reviewing court is bound by the administrative determination." *Hermel, Inc. v. State Tax Commission*, 564 S.W.2d 888, 894 (Mo. banc 1978) (citation omitted). When read together, our cases demonstrate that this Court is loathe to substitute its judgment for the expertise of the Commission in matters of property tax assessment. Absent clear abuse, we will "stay our hand[s]." *Pierre Chouteau Condominiums v. State Tax Commission*, 662 S.W.2d 513, 517 (Mo. banc 1984) (Blackmar, J. concurring).

Assessor's attack on the Commission's market valuation of the property is a narrow one. Assessor does not dispute the Commission's selection of the income capitalization method or the actual mechanics of the Commission's calculation. Rather, Assessor claims that the starting point for the Commission's calculations, which he agrees is and should be the "gross possible annual income" for the property, is understated, thereby inherently producing a market value that is understated to the same degree. Acknowledging that the "gross possible annual income" figure utilized by the Commission is contained in the analysis presented by Taxpayer's expert, Assessor nevertheless maintains that such figure is arbitrary, capricious and unsupported by substantial evidence because: (1) the Commission found that Taxpayer's expert was "not credible"; (2) Taxpayer's expert did not adequately explain or quantify or justify his estimate; and (3) the "gross possible annual income" figure accepted by the Commission was against the overwhelming weight of the evidence which showed that the *actual* gross income for the subject property was substantially higher in both 1983 and 1984. We disagree.

■ Assessor's first contention is based on a mischaracterization of the Commission's findings. Contrary to Assessor's contention, the Commission did not find

that Taxpayer's expert was "not credible." Rather, the Commission found certain of his *analyses* "not credible" based on its determination that other factual components of such analyses, completely unrelated to "gross possible annual income," were either understated, overstated or inadequately explained. Similarly, the Commission rejected various components of the analyses tendered by Assessor's expert, concluding that neither party had tendered an appraisal that could be accepted in its entirety. The Commission, not this Court, is the judge of the credibility of the witnesses and of the evidence. *Missouri Church of Scientology v. State Tax Commission*, 560 S.W.2d 837, 843 (Mo. banc 1977). Likewise, the relative weight to be accorded any relevant factor in a property tax appeal is for the Commission, not the courts. *St. Louis County v. State Tax Commission*, 515 S.W.2d 446, 450 (Mo. 1974).

Assessor is correct that the "gross possible annual income" figure utilized by the Commission was contained in a discounted cash flow analysis ultimately rejected by the Commission. However, we perceive no reason why the Commission's rejection of that particular income capitalization methodology in this instance, based on deficiencies in other components such as expenses, should preclude the Commission from utilizing factual components it finds credible. There may well be instances in which the values assigned particular components are so interdependent that this procedure would not be feasible but Assessor has made no such showing here. Assessor's first contention is denied.

■ Assessor's next complaint is that Taxpayer's expert failed to provide an adequate explanation for his derivation of his projected "gross possible annual income," thereby rendering the Commission's use of such figure unsupported by substantial evidence. To understand the fallacy of this contention, it is important to understand the precise nature of the valuation the Commission and the parties were required to undertake. In Missouri, real property

must be assessed in proportion to value. Mo. Const. art. X, § 3 and 4(a) (1945); § 137.115(1) RSMo.1986;[2] *McKay Buick, Inc. v. Lane*, 569 S.W.2d 740 (Mo. banc 1978). True value in money is defined as the price which the subject property would bring when offered for sale by one willing but under no compulsion to sell it, and is bought by one willing or desirous to purchase, but who is not compelled to do so. *Peterson v. Continental Boiler Works, Inc.*, 783 S.W.2d 896, 900 (Mo. banc 1990). True value in money is defined in terms of value in exchange and not in terms of value in use. *Stephen & Stephen Properties, Inc. v. State Tax Commission*, 499 S.W.2d 798, 801–803 (Mo.1973). Real property includes land itself, whether laid out in town lots or otherwise, and all growing crops, buildings, structures, improvements and fixtures of whatever kind thereon, and all rights and privileges belonging or appertaining thereto. § 137.010(3); *Greene County v. Hermel, Inc.*, 511 S.W.2d 762, 770–71 (Mo.1974).

■ The income capitalization method of valuing real property is a means of satisfying these criteria based on an evaluation of what a willing buyer would pay to realize the income stream that could be obtained from the property when devoted to its highest and best use, in this instance, when operated as a hotel. Under this method, the Commission must project the net income stream that could reasonably be anticipated by an investor/purchaser, discounting future dollars to present levels in order to compensate for risk and the elapsed time required to recapture the initial investment.

■ For many types of income producing properties, such as apartments or office buildings, this calculation may be relatively straightforward. However, as Taxpayer's expert explained in his appraisal report and in his testimony at the hearing, a hotel operation is a unique investment entity. Although the income actually being derived from hotel operations may be readily ascertainable, as it was in this case, that income

**2.** All statutory references are to RSMo.1986 unless otherwise indicated.

stream is the product of four different income-generating sources: land, improvements, business and personal property; yet for real estate assessment purposes, the Commission must value only the real property—*i.e.*, the land and improvements.[3]

Taxpayer's expert further explained that the "business" component of the income currently being derived from the property is the revenue derived through the application of expert management skills and franchise affiliation. A hotel facility is "consumer intensive" requiring a high degree of retail-type labor. Unlike apartment or office properties where leases may extend for one or more years, a hotel will experience a complete turnover of patronage every two-to-four days. A poor reputation may spread quickly and damage the hotel operation. A hotel may also offer food, beverage and other food services requiring a special level of skill. Thus, according to Taxpayer's expert, expert management is critical to a successful operation. In addition, Taxpayer's expert identified several advantages of a franchise contract, including market identification, mass advertising, association with a successful operation, a referral system, value discounts, sales personnel recruitment, management services and assistance, and sales training programs.

· In other words, although the property at issue happens to be a Marriott hotel, what is at issue for tax assessment purposes is not the value of the Marriott hotel; it is the value of the real property which is being used to operate a Marriott hotel. Therefore, the value of the Marriott franchise and business acumen must be excluded if one is to value the property by the income capitalization method. These elements are not part of the "real property" as defined above and, to the extent that these elements influence the income presently being derived from the hotel, that income is not part of the income stream that could reasonably be anticipated by a willing buyer of the land and improvements only.

Based on his experience and evaluation of the specific property, Taxpayer's expert testified that the earnings currently being realized from the property are in fact being profoundly and positively influenced by its identification with Marriott. Specifically, Marriott contributes managements skills, name identification and its franchise, which includes access to one of the largest reservations networks in the world with over five thousand computer connections linked to travel companies world-wide. According to Taxpayer's expert, none of these factors are attributable to the real property and all of them contribute to enhanced earnings.

In an attempt to account for and remove the impact of these factors, Taxpayer's expert studied average daily rates and occupancy rates of competing hotels, in the immediate vicinity of the Marriott and nationally, based on reports recognized as authoritative in the appraisal field. Based on this examination, Taxpayer's expert concluded that the occupancy rate being achieved by the property was exceeding both the local and nationwide markets and was about average in terms of daily room rates. In his opinion, the superior occupancy rate was directly related to the Marriott name identification and franchise such that, if these elements were removed, the occupancy rate would drop significantly.

■ In order to eliminate the impact of these non-assessable factors in his projection of "gross possible annual income," Taxpayer's expert calculated income levels for the property based on market occupancy and room rental rates instead of the higher occupancy and rental rates being realized by Marriott. Significantly, he further testified that this was the same manner in which a prudent investor would project income—*i.e.*, an investor would use market characteristics as opposed to actual operations of the property.

We find that the foregoing evidence adequately supports the Commission's decision to accept Taxpayer's expert's projection of "gross possible annual income" as the

---

**3.** Tangible personal property is, of course, also taxable, but is not included in the subject property of this appeal, which concerns only the assessment of the real property. § 137.010(4) RSMo.1986.

starting point for its calculation of value pursuant to the income capitalization method. Although the precise numerical derivation of the figure set forth in the expert's testimony was not placed in evidence, the narrative explanation of the adjustments performed and the rationale therefor were sufficiently explained and justified to enable the Commission to evaluate the weight that should properly be accorded to the data supplied. The magnitude of the adjustment was readily apparent from a comparison to the actual income derived during the tax year. Moreover, assessments and the valuation of real estate for taxation are never subject to exact ascertainment and are, at best, matters of opinion and estimate on the part of the taxing officials. *John Calvin Manor, Inc. v. Aylward*, 517 S.W.2d 59, 63 (Mo.1974); *Stein v. State Tax Commission*, 379 S.W.2d 495, 498 (Mo. 1964). On this record, we find that Taxpayer's failure to supply greater detail in support of its mathematical calculations merely affects the weight, not submissibility of the evidence, a determination which lies within the sound discretion of the Commission. Assessor was afforded the opportunity to probe any perceived deficiencies on cross-examination. Under such circumstances we hold that the "gross possible annual income" figure was supported by substantial evidence and rule this contention against Assessor.

Assessor's final attack on valuation is that the "gross possible annual income" figure utilized in the Commission's calculation of value is contrary to the overwhelming weight of the evidence because it is lower than the *actual* income realized by the Marriott in both 1983 and 1984 and well below Marriott's own projections. However, in light of our determination that the evidence before the Commission fully justified a finding that Marriott's actual income reflected factors which are not attributable to the real property alone, it would be surprising if this was not the case. Indeed, the Commission's rejection of the "gross possible annual income" submitted by Assessor's expert was expressly attributed to his reliance on actual operating results instead of market data. We find no merit in Assessor's contention and therefore affirm the Commission's findings with respect to the value of the property.

*Taxpayer's Appeal—Assessment Ratio*

Taxpayer's appeal is directed to the assessment ratio applied to the property value determined by the Commission. Section 138.100.1(2)[4] requires that the assessed valuation of real property be reduced if its assessment percentage exceeds the average valuation of all real property in the county.[5] Pursuant to § 536.070(6), the Commission took official notice of its 1984 assessment ratio study and the fact that, as shown in such study, the average assessment ratio for real property in St. Louis County was 16.1%. This was the (rounded) arithmetic mean as indicated in the study. Taxpayer did not contest the methodology, findings, conclusions or the application of the ratio study to the subject property. However, both before the Commission and on appeal, Taxpayer objects to the application of the mean ratio of 16.1% contending that the "appropriate measure of central tendency" for the purpose of achieving equality of assessment is the 12.2 percent *median* ratio of assessment. Thus, Taxpayer maintains that the Commission improperly interpreted the terms "average valuation of all the real ... property of the county" appearing in § 138.-100.1(2) to require use of the arithmetic mean ratio as opposed to the median ratio and that such interpretation does not satisfy the requirements of Article X, § 3 of the Missouri Constitution (1945) for uniformity

4. Section 138.100.1(2) provides:
 (2) They shall reduce the valuation of such tracts or parcels of land or of any tangible personal property which, in their opinion, has been returned above its true value as compared with the average valuation of all the real and tangible personal property of the county.

5. Strictly speaking, § 138.100.1(2) applies to the Board of Equalization. However, as the Commission recognized, the Commission is obliged to enforce this provision on appeal. *See* §§ 138.410(1), 138.430(2); *State ex rel. Cassilly v. Riney*, 576 S.W.2d 325, 330 (Mo. banc 1979).

of taxation upon the same class of property within each taxing jurisdiction.

■ At first blush, Taxpayer's contentions appear to involve construction of the revenue laws and/or the state constitution, which are matters within the exclusive jurisdiction of the Missouri Supreme Court. Mo. Const., art. V, § 3. However, when an appeal can be disposed of by the application of a prior supreme court construction, the supreme court does not have exclusive jurisdiction. *Knowlton v. Ripley County Mem. Hosp.*, 743 S.W.2d 132, 133 (Mo.App. 1988). Even if the supreme court has not addressed the argument directly, jurisdiction is not exclusive if the argument was addressed implicitly. *Walter–Kroenke Properties v. State Tax Comm'n*, 742 S.W.2d 242, 243 (Mo.App.1987). We hold that Taxpayer's appeal does not fall within the exclusive jurisdiction of the Missouri Supreme Court. Although characterized by Taxpayer as a question of statutory interpretation, upon closer analysis it is clear that Taxpayer's real complaint is that the Commission's order is not supported by substantial evidence.

Relying on *Breckenridge Hotels Corp. v. Leachman*, 571 S.W.2d 251, 252 (Mo.banc 1978), Taxpayer asserts that it is constitutionally entitled to have its assessment reduced to "the percentage of [true value] at which others are taxed." Acknowledging that § 138.100.1(2) provides for a reduction of assessments which are above the "average" valuation of real property in the county, Taxpayer maintains that the expert testimony adduced at trial established that (1) both the median and the mean are recognized measures of "central tendency"; (2) the median is the preferred measure of central tendency for assessment purposes and is the standard recognized by the International Association of Assessment Offices; and (3) the median will most typically be like all other ratio values with a greater degree of consistency than any other ratio value. Further, because the median is the absolute center of any group of numbers whereas the mean is produced by dividing the total of all ratios by the number of ratios, the mean will be influenced by out-lying or extreme values whereas the median will remain relatively constant. Thus, according to Taxpayer's evidence, the median best typifies the assessed value of the mass of property within the county. Use of the median would ensure that 50% of properties were assessed at a ratio above the Taxpayer's property and 50% below. According to Taxpayer's expert, use of the mean in this instance results in an assessment ratio which is higher than 75% of properties and lower than just 25% of properties.

In sum, Taxpayer urges that the median assessment ratio provides competent and substantial evidence of the "percentage value at which others are taxed" whereas the mean ratio results in assessment of property at a greater proportion of true value than other property generally within the county. Thus, Taxpayer concludes, the Commission's adoption of the mean ratio as the average level of assessment for equalization purposes misinterprets and misconstrues § 138.100.1(2) and the uniformity provisions of the federal and state constitutions.

■ The most obvious deficiency in this analysis is that it focuses almost entirely on the issue of whether Taxpayer's position was supported by substantial evidence. On appeal from an order of the Commission, the issue is not whether the losing parties' position was supported by substantial evidence; it is whether the Commission's decision is supported by substantial evidence. The fact that the evidence might have supported a different result is irrelevant. If the evidence supports more than one finding, we are bound by the Commission's determination. *Becker v. Missouri Dept. of Corr. & Human Serv.*, 780 S.W.2d 72, 76–77 (Mo.App.1989). Only if the decision reached by the Commission was arbitrary, capricious, unreasonable, unlawful, or in excess of the Commission's jurisdiction is there grounds for reversal. *Savage v. State Tax Commission*, 722 S.W.2d 72, 74–75 (Mo.banc 1986). Further, we must consider the evidence in the light most favorable to the Commission's decision. *Hermel, Inc. v. State Tax*

*Commission,* 564 S.W.2d 888, 894 (Mo.banc 1978).

 In light of these principles, the Missouri Supreme Court's decision in *Savage v. State Tax Commission, supra,* is dispositive of the issues presented by Taxpayer's appeal. In *Savage,* the supreme court expressly held that the average level of assessment found by the Commission's ratio studies constitutes substantial evidence of the level at which other taxpayers similarly situated were assessed where, as here, there has been no general reassessment and there is no "common level of assessment." *Savage,* 722 S.W.2d at 79. Further, the court rejected the contention, similar to that advanced by Taxpayer here, that the language of *Breckenridge Hotels Corp. v. Leachman,* 571 S.W.2d 251, 252 (Mo.banc 1978), mandating assessment at the level "placed upon the general mass of other property in the county," requires a reduction to the "common" level as opposed to the "average" level. *Id.* "Average level of assessment" was expressly defined as the "arithmetic mean," the measure utilized by the Commission in this case. *Id.*

Taxpayer correctly observes that *Savage* did not consider whether the mean or the median ratio was the better measure of the level at which others were assessed. That is not the issue presented in this appeal either. As we have observed, the issue is whether the arithmetic mean ratio is substantial evidence of the level at which others are assessed, not whether some other measure might be equally good or even superior. *Savage* holds that the arithmetic mean ratio is sufficient evidence to support the Commission's reduction to that level as a remedy for discrimination caused by the failure to assess all property uniformly at the constitutionally required level. Thus, the Commission's use of the arithmetic mean is supported by substantial evidence.

Taxpayer's contention that "average" must be interpreted to mean "median" in order to satisfy constitutional uniformity requirements also presupposes a level of precision in assessment that has never been required. As our supreme court observed in *Cupples Hesse Corp. v. State Tax Commission,* 329 S.W.2d 696, 700 (Mo. banc 1959) and reconfirmed in *Savage,* 722 S.W.2d at 78–79, absent evidence of intentional discrimination, the recognized constitutional standard is that assessments must not be "so grossly excessive as to be inconsistent with an honest exercise of judgment." Such a standard recognizes that "while practical uniformity is the constitutional goal, absolute uniformity is an unattainable ideal." *Savage,* 722 S.W.2d at 78–79, quoting *Justus v. Board of Equalization of Kootenai County,* 101 Idaho 743, 620 P.2d 777, 781 (1980), and *Sperry Corp. v. State Tax Commission,* 695 S.W.2d 464, 467 (Mo.banc 1985). As the United States Supreme Court has observed, "mere errors of judgment do not support a claim of discrimination ... there must be something more—something which in effect amounts to an intentional violation of the essential principle of practical uniformity." *Sioux City Bridge Co. v. Dakota County, Neb.,* 260 U.S. 441, 447, 43 S.Ct. 190, 192, 67 L.Ed. 340, 343 (1923).

The dispute in this case does not involve an attempt to tax Taxpayer at the statutory level of one-third of true value while others have been assessed at a lesser percentage. Rather, the dispute is over how best to measure the percentage level at which others have been assessed so that the same ratio can be applied to Taxpayer. It is conceded that there was no single common level applied to all taxpayers. Under such circumstances, reasonable minds may well differ on the question of whether the median or the mean is the most representative measure. Neither measure would accomplish absolute uniformity unless every taxpayer appealed, in which case either measure, consistently applied, would result in uniformity.[6] There is no sugges-

---

6. Contrary to Taxpayer's contentions at the hearing and in its brief, the mean would not change with each revaluation on appeal. The mean utilized by the Commission is the arithme-

tic mean of a statistically valid *sample* of properties that is not recalculated with each revaluation. Rather, its value is fixed at the time the ratio study is performed and does not change

tion that the mean was selected for discriminatory reasons or that the median and mean ratios produce such grossly disproportionate results as to be "inconsistent with the exercise of honest judgment." Indeed, Taxpayer concedes that the Commission utilized the mean in part to achieve consistency among all appeals for the 1984 tax year. Thus, there is no basis for a finding that the Commission's use of the arithmetic mean assessment ratio was unconstitutionally discriminatory and, consequently, no merit in Taxpayer's contention that the term "average" must be construed to mean "median" in order to satisfy constitutional uniformity requirements.

Finally, Taxpayer urges that the Commission's use of the mean assessment ratio is arbitrary, capricious and against the overwhelming weight of the evidence because the only witnesses who testified endorsed the median assessment ratio as the most appropriate equalization factor for equalizing assessment. This presupposes, of course, that the selection of the most appropriate factor was a matter beyond the Commission's own expertise. In this regard we note that the ratio studies themselves are conducted under the Commission's auspices. Further, as we have observed, the Missouri Supreme Court has held that the mean assessment ratio as found in the Commission's assessment ratio studies is substantial evidence of the level at which others are assessed and may be used for equalization purposes. *Savage*, *supra*, 722 S.W.2d at 79.

Under such circumstances, we believe that the Commission was free to reject the expert's recommendations that the median ratio be used to equalize the assessment. As we have seen, neither the mean nor the median embody a "common level" of assessment. There was no "common level" for the tax year. Further, the evidence supporting the use of the median was, at best, equivocal.[7] As our supreme court observed in *Savage*, the General Assembly has wisely provided an administrative agency to deal with the specialized problems of property tax assessment and courts are loathe to substitute their judgments for the Commission in such matters. *Savage*, 722 S.W.2d at 75. We find that the Commission's decision to use the mean assessment ratio to equalize Taxpayer's assessment was within its discretion and assigned area of expertise and was not contrary to the overwhelming weight of the evidence.

For the foregoing reasons, we conclude that Taxpayer's appeal involves only evidentiary issues within our jurisdiction and affirm the Commission's order with regard to equalization of Taxpayer's assessment.

CARL R. GAERTNER, P.J., and CRANE, J., concur.

---

thereafter. The same is true of the median. Therefore, if every taxpayer appealed and obtained relief, adjusting all taxpayers to either the mean ratio or the median ratio would result in uniformity.

**7.** For example, Mr. Follina, the manager of ratio studies of the Commission, admitted that his study resulted in a non-normal distribution pattern and that given such a pattern, the mean ratio would be the more appropriate and representative measure of determining central tendency.