PERUQUE, LLC, Appellant,

v.

Scott SHIPMAN, Assessor of St. Charles County, Missouri, Respondent.

No. ED 96232.

Missouri Court of Appeals, Eastern District, Division One.

Oct. 11, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 14, 2011.

Application for Transfer Denied Jan. 31, 2012.

James P. Bick, Jr., Sean M. Elam, St. Louis, MO, for appellant.

Charissa L. Mayes, St. Charles, MO, for respondent.

## GARY M. GAERTNER, JR., Judge.

### Introduction

Peruque, LLC (Peruque) appeals from the decision of the trial court affirming the State Tax Commission's (STC) decision in a tax assessment case. Peruque raises five points on appeal. We reverse and remand.

### Background

Peruque's business is to develop raw land into buildable lots that can be sold to home builders. (LF 40) Peruque filed a subdivision plat in 2003 for the Carlton Glen Estates subdivision in Wentzville, Missouri, consisting of 504 lots. Peruque had developed and sold 336 lots, and at issue were the 168 remaining lots, which were in the process of being developed into buildable residential lots.

The parties agreed that 38 of those 168 lots were fully developed and ready for home construction, in that they had utilities and paved roads on all frontages (fully developed properties). The St. Charles County Assessor (the Assessor) contended that ten additional properties were fully developed, in that they were adjacent to the fully developed properties, had paved frontage, and had utilities accessible to the lots. Peruque disputed the Assessor's determination that they were fully developed (disputed properties). The parties agreed that the remaining 120 properties were partially developed (partially developed properties). The developed properties were scattered throughout the subdivision, and the partially developed properties were located in two contiguous groups in Village C and Village D.

John Pearson, the independent project manager hired by Peruque for the Carlton Glen Estates subdivision, submitted written testimony that on January 1, 2007, the partially developed properties were cleared and rough graded, but they did not have utility services, which he defined as "a sanitary sewer lateral, access to tap a water main with a service line, the required storm sewers for site drainages, electrical service and/or gas services." As of January 1, 2007, a sanitary sewer was available but sewer mains had not been installed to serve all partially developed properties; water was available but water mains had not been installed; electric and gas were available but electric lines and gas mains had not been installed; and storm sewers were available but had not been installed to drain or serve the partially developed properties.

### 1. Valuation

#### Partially Developed Properties

The Assessor initially assessed the partially developed properties as individual lots valued at $44,000 each, as of January 1, 2007. The St. Charles County Board of Equalization (Board) sustained this assessment. Peruque then appealed, on the ground of overvaluation, to the STC. The following evidence was adduced at a hearing before an STC hearing officer.

An appraiser hired by Peruque used the cost approach to determine the value of the 28.26 acres of partially developed land (120 partially developed properties plus 10 disputed properties) at $93,843/acre, for a total parcel value of $2,652,000. Peruque's appraiser recommended that the highest and best use of the partially developed land was to hold it for future development until sufficient demand returned after absorption of the currently oversupplied market. Peruque's appraiser also noted that the cost to complete the partially developed properties as a group was $11,589 per lot.

Steven Riney, an employee for the Assessor, submitted an appraisal report valuing the 120 partially developed properties at $45,000 per lot, based on a comparable sales approach. Riney compared 18 sales in the close or immediate vicinity with an average sale price of $53,437. Noting the "poor" access to the partially developed properties, Riney adjusted the value of each lot downward by an average amount of $5,344 (10%).

*Fully Developed Properties*

The Assessor initially appraised the fully developed properties at $55,000 per lot, as of January 1, 2007. The Board sustained this assessment. Peruque appealed to the STC on the ground of overvaluation. The following evidence was adduced at a hearing before the hearing officer.

For the value of the fully developed properties, Peruque's appraiser determined an average lot price of $50,000, relying on a combination of a "bulk lot sales comparison" approach and a "discounted wholesale lot value" approach. Peruque's appraiser identified the fully developed properties as a "package" of medium-density residential lots, primarily with 70–foot frontages.

For the "bulk lot sales comparison" approach, Peruque's appraiser compared the package of properties with the following four bulk sales of developed properties in surrounding areas. Bulk Lot Sale # 1: 28 lots with 80–foot frontages for $62,000; Bulk Sale Lot # 2: 11 lots with 80–foot frontages for $53,300; Bulk Lot Sale # 3: 55 lots with 62–foot frontages for $62,500; and Bulk Lot Sale # 4: 68 lots with 60–foot frontages for $60,500. Peruque's appraiser then adjusted the sale price in comparison to the lots at issue here for sale condition, sale date, lot frontage and size, location, and amenities. Based on the market data, Peruque's appraiser concluded $50,500 was the most reasonable whole-sale lot value for the fully developed properties here.

For the "discounted wholesale lot value" approach, Peruque's appraiser looked at 12 individual sales of medium density properties with frontages averaging 80 feet and an average size of 12,620 square feet, occurring in the last 9 months in the immediate market area, for sale prices ranging between $60,000 and $75,000 with an average of $63,542 and a median of $60,000. Based on these comparables, Peruque's appraiser concluded a lot price of $65,000 if purchased by an individual buyer. However, noting that it was much more common for developed land to be purchased by a builder than an individual buyer, Peruque's appraiser assumed a builder would purchase the lots in bulk, and therefore calculated a discount rate of 16 percent for a discounted wholesale value of $42,000 per lot.

Using a comparable sales approach, Riney assessed a value for the fully developed properties of $55,000 per each of the 48 individual lots. Riney again looked to the 18 comparable sales in the close or immediate vicinity with an average sale price of $53,437. The comparison homes had an average of .23 acres per lot, and were all sold between March 2006 and December 2007.

## 2. STC Decisions

After the hearing, the hearing officer (1) concluded that the partially developed property consisted of 120 individual lots, and sustained the Board's valuation for 105 lots at $44,000 each but adopted the Assessor's valuation for 15 lots at $45,000 each; and (2) determined that 48 lots were fully developed and sustained the Board's valuation of $55,000 for each. The hearing officer specifically rejected Peruque's appraisal methods for the fully developed properties, noting that "[n]o statute, case

law, or administrative rule in Missouri [had set] forth the method of determining true value as suggested by [Peruque] by using a bulk sale or a discounted cash flow." The hearing officer likewise rejected Peruque's valuation of the partially developed properties as a single parcel, finding that because the property here had been improved and was not contiguous, Section 137.119, RSMo. (2000)'s single-parcel valuation approach was not proper.

Peruque applied to the STC for review of the hearing officer's decision and order. The STC affirmed the decision of the hearing officer, finding no grounds upon which to reverse or modify. The STC incorporated the hearing officer's decision into its final order "as if set out in full." Peruque filed an application for review with the St. Charles County Circuit Court, which affirmed the STC's decision. This appeal follows.

*Standard of Review*

■ We review the underlying decision of the administrative agency, the STC, rather than the judgment of the trial court. *Algonquin Golf Club v. State Tax Comm'n,* 220 S.W.3d 415, 418 (Mo.App. E.D.2007). Our review is limited to determining whether the agency decision is supported by competent and substantial evidence, or whether it was an abuse of discretion and was arbitrary, capricious, or unreasonable. *Id.* Absent an abuse of discretion, we consider the evidence in the light most favorable to the STC and "[i]f the evidence supports either of two opposing findings, we are bound by the STC's determination." *Id.* However, if the administrative decision is based on its interpretation and application of law, we review the agency's decision and the conclusions of law de novo. *Id.* In reaching its decision, the STC construed Section 137.115,

RSMo. (2008) and Section 137.119, and, accordingly, our review is de novo.

■ This court reviews the decision of the STC and not the hearing officer, *Cohen v. Bushmeyer,* 251 S.W.3d 345, 350 n. 4 (Mo.App. E.D.2008), unless, as here, the STC incorporated the decision of hearing officer, in which case we consider both together, *Loven v. Greene County,* 94 S.W.3d 475, 477 (Mo.App. S.D.2003).

*Discussion*

*Points A and B*

For points A and B, Peruque in essence argues that the STC erred in determining that the partially developed lots must be valued as individual lots rather than as two single parcels of undeveloped land. We agree.

Section 137.119 provides that, "the filing of a real property subdivision plat ... shall not, singularly, result in a change in classification or an increase in the appraised value of such property. All contiguous lots and lands for which a plat has been filed shall be combined and valued as a single parcel if no improvements have been made to such lots or lands." Our application of this statute depends on the meaning of the term "improvement."

■ "Absent a statutory definition, the primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute." *E & B Granite, Inc. v. Dir. of Revenue,* 331 S.W.3d 314, 318 (Mo. banc 2011) (citation omitted). A court will only look beyond the plain meaning of the statute when the language is ambiguous or would lead to an illogical result. *Spradlin v. City of Fulton,* 982 S.W.2d 255, 258 (Mo. banc 1998).

■ The plain meaning of a term may be found in a dictionary. *E & B Granite,*

*Inc.*, 331 S.W.3d at 318. Black's Law Dictionary provides two relevant definitions: "improvement" is defined as "an addition to real property, whether permanent or not; esp., one that increases its value or utility or that enhances its appearance"; and "improved land" is defined as "real property that has been developed." Black's Law Dictionary 761 (7th ed.1999).

Likewise, Missouri case law has defined "improvement" as: (1) "a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs," *see Howell v. Lone Star Indus., Inc.*, 44 S.W.3d 874, 878 (Mo.App. E.D. 2001) (worker's compensation) (citation omitted); *Four Seasons Lakesites Prop. Owners Ass'n, Inc. v. Dungan*, 803 S.W.2d 173, 175 (Mo.App. S.D.1991) (covenants) (citation omitted); or (2) "work done or things built or placed upon land, rendering it more fit for use, and more capable of producing income," *see Howell*, 44 S.W.3d. at 878 (citation omitted). The first definition appears to give guidance for differentiating between an improvement or repair to an existing structure, while the second speaks to affixing new structures to land.

██ In light of these multiple definitions, we return to the plain language of the statute to determine legislative intent. Section 137.119, by its plain language, gives protections to developers from higher assessments on property that has been slated for development but upon which work has not yet begun. That appears to be the situation here.

Moreover, this legislation, adopted in 1993, seems reactive to the STC's 1991 decision finding that lots in a developing subdivision should be valued individually. *Hammons v. Savage*, Nos. 90–33000 through 90–333140, 1991 WL 186916, at *7 (Mo. St. Tax Comm'n, Aug. 30, 1991). Section 137.119 abrogated this approach. Further, Section 137.119 is consistent with prior appellate case law, which held, "[r]aw land with little or no improvements or preparation for subdivision may not be valued as if the land were a subdivision; thus the 'lot method' approach to valuation may not be used." *State of Mo., ex rel. State Highway Comm'n v. Williamsville Stone Co.*, 622 S.W.2d 407, 409 (Mo.App. 1981).

In its decision, the STC relied on a judgment of the Circuit Court of St. Charles County, which we also find persuasive, if for different reasons. *Peruque v. Shipman*, Nos. 07–32728 through 07–32895, at 13 (Mo. St. Tax Comm'n, June 25, 2009) (citing *Zimmerman v. State Tax Comm'n of Mo.*, No. CV194–2460CC (Cir. Ct. St. Charles Co., Mo., March 13, 1995)). While the Circuit Court did not propose a guide for when to find land improved, it posited that not all property in a plat will be improved simultaneously. Accordingly, the Circuit Court suggested that, as improvements are made to a particular lot, the developed parcels may be split from the unimproved portion and valued individually, while the remaining contiguous unimproved property continues to be valued as a single parcel.

There is no bright line rule determining at what point a property is improved; rather, it is best determined from the circumstances of each case. Here, the record showed that as of January 1, 2007, the partially developed properties had been cleared and rough graded, but there were no paved access roads. Further, a sanitary sewer was available but sewer mains had not been installed to serve all 120 lots; water was available but water mains had not been installed; electric and gas were available but electric lines and gas mains had not been installed; and storm sewers

were available but had not been installed to drain or serve the partially developed properties. The photographs of the property included in the record showed images of empty, partly cleared fields with several fire hydrants, man holes, and utility "stubs," but no other signs of building or development.

Looking at the facts of this case, it appears that as of January 1, 2007, the partially developed land here had no improvements as envisioned by Section 137.119. Although surrounded by developed and improved lots, these remaining 120 [1] platted lots in two contiguous groups were not improved, and should have been valued as single parcels of land rather than individual lots. We reverse for an assessment consistent with this opinion.

Points granted.

### Points C and D

In points C and D, Peruque contends that the STC erred in misinterpreting Missouri law to bar the use of "bulk sales," in that it refused to consider Peruque's bulk sale methodology in arriving at a value for the fully developed properties, which was in fact the comparable sale methodology and thus authorized under Section 339.535, RSMo. (2000). We agree.

■ Section 137.115.1 requires that all real property be assessed according to its "true value in money" on the first of January each year. True value in money is the price that the property would fetch from a willing seller when offered for sale by a willing buyer. *Cohen,* 251 S.W.3d at 348. It is the fair market value of the property on the valuation date, considering its highest and best use, which is the use of the property that will produce the greatest return in the reasonably near future. *Snider v. Casino Aztar/Aztar Mo. Gaming Corp.,* 156 S.W.3d 341, 346 (Mo. banc 2005). Determining the true value in money is an issue of fact for the STC. *Cohen,* 251 S.W.3d at 348.

■ The value of real property is generally determined using one or more of three generally accepted approaches: (1) the cost approach, which is based on the reproduction or replacement cost; (2) the income approach, which determines the value by estimating the present worth of what an owner will likely receive in the future as income from the property, for example as rental income; and (3) the comparable sales approach, which looks to the prices paid for similar properties and adjusts those prices to account for differences between the properties. *Casino Aztar/Aztar Mo. Gaming Corp.,* 156 S.W.3d at 347–48. Property should be valued according to the use that is readily available. *Id.* at 349. The parties do not dispute that the highest and best use of the fully developed properties is as a residential subdivision.

■ In matters of assessing property tax, we acknowledge "the wisdom of the General Assembly in providing an administrative agency to deal with this specialized field." *Savage v. State Tax Comm'n of Mo.,* 722 S.W.2d 72, 75 (Mo. banc 1986) (citation omitted). The STC here adopted a comparable sales approach, which we will not second guess. *Nance v. State Tax Comm'n of Mo.,* 18 S.W.3d 611, 615 (Mo. App. W.D.2000) (proper method of valuation and assessment of property are dele-

---

1. It appears that Peruque does not challenge the STC's determination of the 10 disputed properties as fully developed. Allegations of error not developed in the argument portion of a party's brief on appeal are waived. *No-*

*land–Vance v. Vance,* 321 S.W.3d 398, 411 n. 13 (Mo.App. S.D.2010). We therefore divide the properties into 120 unimproved properties and 48 fully developed properties.

gated to STC). However, once the STC has chosen an approach, it must apply that approach properly and consider all factors relevant to that approach. *Casino Aztar/Aztar Mo. Gaming Corp.*, 156 S.W.3d at 348.

■ Peruque asserts on appeal that the STC erred in failing to consider the comparable-sales evidence that it presented. We agree. It is clear from the record that both Peruque and the Assessor primarily[2] used the comparable sales approach in valuing the fully developed properties. What differed between their methodologies was that Peruque's four comparison sales were sales of a group of lots to one builder, while the Assessor's eighteen comparison sales were of individual lots. It appears from the face of the STC's decision, however, that the hearing officer neither recognized Peruque's assessment as based primarily on a comparable sales approach, nor considered the comparison sales presented by Peruque in support of its valuation. Rather, the decision declared, "[n]o statute, case law, or administrative rule in Missouri sets forth the method of determining true value as suggested by [Peruque] by using a bulk sale[3] .... The State Tax Commission has treated lots in a subdivision development as individual entities and each lot's value determined individually, most commonly by the sales comparison approach."

■ Had the hearing officer's decision examined both sets of comparison sales and then found the Assessor's evidence to carry more weight or credibility, we would, under our standard of review, be bound by that decision. *Algonquin Golf Club*, 220 S.W.3d at 418. If, however, the STC fails to consider all factors relevant to the approach it has chosen, we may intervene. *Casino Aztar/Aztar Mo. Gaming Corp.*, 156 S.W.3d at 348. We find that the STC's decision was not supported by competent and substantial evidence on the record as a whole. *Algonquin Golf Club*, 220 S.W.3d at 418.

Because we cannot determine from the record before us that the STC considered all the factors relevant to the comparable sales approach, as it was required to do, we reverse for the STC to perform a complete analysis considering all the relevant evidence.

Points granted.

### Point E

In its last point on appeal, Peruque contends that the STC erred in admitting the testimony and valuation evidence of Steve Riney, in that it failed to comply with Mo.Code. Regs. 12 § 30–3.065 (2011) and was speculative rather than founded on data. We disagree.

We review the decision to admit or exclude expert testimony for an abuse of discretion. *Cf. Glaize Creek Sewer Dist. of Jefferson Co. v. Gorham*, 335 S.W.3d 590, 593 (Mo.App. E.D.2011). Likewise, we defer to the STC on issues of witness credi-

---

**2.** While Peruque's appraiser used both a "bulk lot sales comparison" approach and a "discounted wholesale lot value" approach, the final appraisal value of $50,000 reflected the comparison-based value of $50,500 much more than the discounted wholesale value of $42,000.

**3.** Moreover, we question the accuracy of the hearing officer's statement, considering that the STC in the past has considered bulk sales rather than individual sales in determining the true value of a property. *Cf. Dzatko v. Zimmerman*, STC 01–32558 through 132561 (Mo. State Tax Comm'n, April 29, 2002) (regarding four-unit condominium, because property was offered for sale as single property rather than four individual properties, using individual lot comparison was improper), *available at http://www.stc.mo.gov/2002/dzatko_v._zimmerman*.

bility and the weight of evidence. *Equitable Life Assurance Soc'y of U.S. / Marriott Hotels, Inc. v. State Tax Comm'n of Mo.*, 852 S.W.2d 376, 380 (Mo.App. E.D.1993). As a rule, "questions as to the sources and bases of the expert's opinion affect the weight, rather than the admissibility of the opinion." *Gorham*, 335 S.W.3d at 593 (citation omitted).

Although we note that Riney's assessment did not set forth a detailed explanation for how he reached a true value in money of $55,000 for the fully developed properties, the record contained sufficient explanation to enable the STC to evaluate the weight that should be accorded the data supplied. *Equitable Life Assurance Soc'y of U.S. / Marriott Hotels, Inc.*, 852 S.W.2d at 382. Riney's direct written testimony, which was submitted to the hearing officer, stated that in weighing the comparison sales, he considered the size, location, topography, shape, and utility access of the various properties. We recognize that "assessments and the valuation of real estate for taxation are never subject to exact ascertainment and are, at best, matters of opinion and estimate on the part of the taxing officials." *Id.* Looking to the record in full, we find that any deficiency in the details of Riney's assessment affected merely the weight, not the admissibility of the evidence. *Id.*

Moreover, we note that Peruque took full advantage of its opportunity to cross-examine Riney regarding his assessment, and the record is replete with Peruque's arguments regarding Riney's qualifications and valuation methodology. *Id.* (failure to supply detailed evidence in support of assessed value affects weight not admissibility of evidence, especially when Respondent was afforded opportunity on cross-examination to probe deficiencies). Under the circumstances, we find that the STC did not abuse its discretion in admitting the

Assessor's evidence, and we decline to substitute our judgment for that of the STC's. *Algonquin Golf Club*, 220 S.W.3d at 418; *Gorham*, 335 S.W.3d at 593.

Point denied.

### Conclusion

The STC erred in valuing the partially developed property as individual lots although they were unimproved and contiguous, and in failing to consider all the evidence presented to it as part of the comparable sales approach. The STC did not err in admitting the testimony and valuation evidence of Riney.

The judgment is reversed and the case is remanded.

CLIFFORD H. AHRENS, PJ, and ROY L. RICHTER, J, concur.