

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| SEBA, LLC, | ) | |
| | ) | |
| Appellant, | ) | WD83083 |
| | ) | |
| v. | ) | OPINION FILED: June 9, 2020 |
| | ) | |
| DIRECTOR OF REVENUE, | ) | |
| | ) | |
| Respondent. | ) | |

**Appeal from the Administrative Hearing Commission**

Before Division Two: Mark D. Pfeiffer, Presiding Judge, Alok Ahuja, Judge and
Gary D. Witt, Judge

SEBA, LLC ("SEBA") appeals from the Administrative Hearing Commission ("Commission") finding that SEBA is "liable for unpaid sales tax in the amount of $38,540.44, minus the sales tax assessed on $26,567.57 in income generated from SEBA's exempt sales." The Commission also found that SEBA "is also liable for additions to sales tax owed and statutory interest." Article V, sections 3 and 11 of the Missouri Constitution require that this case be transferred to the Supreme Court of Missouri.

**Statement of Facts**

SEBA operates a donut shop called Eddie's South Town Donuts, in St. Louis, Missouri.[1] The Department of Revenue ("Department") conducted an audit of SEBA's sales during October 1, 2011, through September 30, 2014 ("audit period"). During the audit period, Brad Arteaga was the owner and sole member of SEBA. Eddie Strickland ("Strickland") was the business's sole, paid employee. Strickland worked at SEBA daily to make donuts by hand, wait on customers, and clean the store. Arteaga was solely responsible for handling SEBA's financial affairs, and Arteaga went to the store once or twice a week to collect money, credit card receipts, checks, and related paperwork for SEBA. SEBA contracted with, Joseph Otten ("Otten"), a tax accountant, bookkeeper, and financial advisor to file its sales tax returns. Otten prepared all returns during the audit period relying on documents provided by Arteaga including SEBA's bank statements, credit card statements, and check stubs written by Arteaga. SEBA did not use Z-tapes.[2] SEBA's cash register printed one receipt for each transaction, and SEBA either gave the receipt to the customer or threw the receipt away.

On October 16, 2014, Lisa Hoffman[3] ("Hoffman"), an auditor with the Department, requested copies of SEBA's business records, including sales, use, and withholding tax returns, and supporting schedules; federal income tax returns; depreciation schedules, sales journals, sales invoices, sales tax exemption certificates and letters, detailed general

---

[1] For consistency, we refer to Eddie's South Town Donuts as SEBA.

[2] Z-tapes are "tapes printed from the cash register that summarizes the day's sales[.]" *United States v. Koudanis*, 207 F.Supp.3d 115, 121 (D. Mass. 2016).

[3] Hoffman had been employed by the Department for approximately two months when the audit first began. She was still in training, but her supervisor approved all of her work.

ledgers, purchase invoices, payroll registers and W-2's, 1099-K forms, and bank statements. The only documents provided to Hoffman from SEBA were its federal income tax returns, depreciation schedules, bank statements, 1099-K forms, purchase invoices, payroll registers, W-2s, and a general ledger. Because the records provided to Hoffman were incomplete, Hoffman requested that SEBA retain individual cash register receipts for its sales in December 2014 and track its inventory of donuts made in the shop during the month. In response, SEBA provided only partial receipts for the month of December 2014. Hoffman later requested that SEBA maintain and provide proper receipts for April 2015 through June 2015, but SEBA failed to retain the requested records.

Hoffman again requested sales receipts for July 2015, and SEBA provided her with a notebook[4] prepared by Strickland containing handwritten entries of its reported number of donuts made for wholesale and retail, donuts sold at retail, and donuts thrown away as waste. SEBA also provided Hoffman with its reported credit card batch totals, cash register transaction receipts, and a calculation tape for the month. SEBA provided 490 cash register receipts totaling $3,950.23 in sales not including the sales tax paid by the customer. Based on those records the average retail sale was $8.06.

Hoffman noted several discrepancies in SEBA's July 2015 records. First, Strickland's handwritten records only reported its donut sales and did not report any sales for donut holes. Second, SEBA's records indicated that SEBA had $5,590.75 in wholesale donut sales, but the checks and credit payments totaled $4,356.49. Third, SEBA reported

---

[4] The notebook was not offered into evidence. Arteaga testified that he misplaced the notebook and could not recall where it had been stored.

3

that it sold 349.6 dozen retail donuts for the month but made 768 dozen; SEBA claimed that 418.4 dozen were donated to a food pantry. Fourth, each sales receipt had a transaction number, and the first receipt was numbered 1512 and the last receipt was numbered 3066. SEBA provided 490 receipts from which Hoffman believed, based on the receipt numbers, there should have been 1,555. SEBA argued that the discrepancy was based on the fact it would print a second receipt for customers who requested one, but Hoffman did not find this explanation accurate as over two-thirds of the receipts were unaccounted for. Fifth, because SEBA did not have a register capable of making a Z-tape, Hoffman requested SEBA track its daily sales on a calculation tape. The calculation tape provided was inconsistent with the receipts provided, and SEBA offered no explanation for this discrepancy.

Because of these irregularities, Hoffman estimated SEBA's July 2015 sales and then used this estimate to estimate SEBA's sales during the audit period. Hoffman multiplied the average receipt total ($8.06) by the difference in transaction numbers on the receipt ($1,555) for a total of $12,535.93 in retail sales. Hoffman then added the wholesale orders paid by check ($2,944.49), wholesale orders paid by credit card ($1,412.00) for a total of $4,356.49 in wholesale sales. The estimated gross sales for SEBA in July 2015 totaled $16,892.42 ($12,535.93+$4,356.49). Hoffman then calculated a cash/credit sales ratio for July 2015. In doing so, Hoffman took the combined retail and wholesale credit card payment per batch total ($4,699.42) and divided it by the total estimated sales ($16,892.42), from which she determined that 28% of SEBA's total sales were credit card sales. Hoffman

4

estimated that SEBA's cash sales were $12,193.10, which meant that SEBA's cash sales constituted 72% of its total sales.

Hoffman then applied these ratios to the known credit card sales during the audit period to estimate gross sales for the audit period. Hoffman added $6,700.73 in Groupon sales. Hoffman also subtracted SEBA's exempt sales for the entities which SEBA provided valid exemption certificates. Because SEBA did not provide exemption certificates for St. John the Baptist Catholic Church ("St. John"), Emmanuel Episcopal Church, Phillips 66 Station, Seven-Eleven, Waters Auto Centers, Inc., and St. Patrick Center, Hoffman included sales to these entities in her calculation for sales tax owed.[5] Hoffman concluded that SEBA under-reported its taxable sales on its sales tax returns in the amount of $400,483.72 during the audit period. Based on the amount of under-reported taxable sales Hoffman determined it failed to pay $23,431.89 in sales tax. Hoffman also recommended additions to tax in the amount of 5% because SEBA "displayed intentional disregard and negligence by failing to double check [its] sales tax figures to verify they were accurate." The Department assessed SEBA with a total liability of $38,540.44, which includes the $34,313.87 in underpaid taxes, $1,715.70 based on a five percent addition to the tax, and $2,510.87 in interest as of January 1, 2016.

_____

[5] At the hearing, SEBA established that its sales to Phillips 66 Station and Seven-Eleven were exempt from sales tax because it provided signed exemption certificates for these entities, which were accepted into evidence. These exempt sales totaled $26,567.57. SEBA referenced the Official Catholic Directory ("Directory"), which SEBA believes identifies St. John and St. Patrick Center as entities affiliated with Archdiocese of St. Louis ("Archdiocese"). SEBA did not offer the Directory into evidence at the hearing and it is not in the legal file before this court.

SEBA filed a complaint appealing the Department's assessment of sales tax, additions to tax, and statutory interest for the audit period. The Commission held a hearing on February 22, 2019. The Commission found that SEBA was liable for unpaid sales tax in the amount of $38,540.44, minus the sales tax assessed on $26,567.57 (the sales to Emmanuel Episcopal Church, Phillips 66 and Seven-Eleven). The Commission found that SEBA was liable for additions to tax because "SEBA was negligent in its report of its taxable sales. It failed to keep adequate records and what records it did retain were inconsistent." The Commission also found SEBA liable for statutory interest.

## Discussion

SEBA asserts three points on appeal. First, it alleges that the Commission erred in finding SEBA had $400,483.72 in taxable total sales during the audit period, and was liable for $34,313.87 in additional sales tax. Second, it argues that the Commission erred in ruling SEBA failed to prove its sales to St. John and St. Patrick Center were exempt. Third, SEBA argues that the Commission erred in in imposing a 5% addition to tax as a penalty in that SEBA was not negligent as a matter of law because it double checked its records before filing its returns.

Before we address the merits, we must determine if jurisdiction lies with this Court. "Although neither party raised an issue concerning our appellate jurisdiction, the Court has an obligation, acting *sua sponte* if necessary, to determine its authority to hear the appeals that come before it." *Maly Commercial Realty, Inc. v. Maher,* 582 S.W.3d 905, 910 (Mo. App. W.D. 2019) (internal citations and quotation marks omitted). The Missouri Constitution confers exclusive appellate jurisdiction to the Missouri Supreme Court in all

6

cases involving the construction of the revenue laws of this state.  MO. CONST. art. V, § 3.

"Revenue law" is defined as a law that "directly creates or alters an income stream to the

government . . . establishes or abolishes a tax or fee, changes the rate of an existing tax,

broadens or narrows the base or activity against which a tax or fee is assessed, or excludes

from or creates exceptions to an existing tax or fee." *Alumax Foils, Inc. v. City of St. Louis*,

939 S.W.2d 907, 910 (Mo. banc 1997).  "Construction" of a law is defined as "determining

the meaning and proper effect of language by a consideration of the subject-matter and

attendant circumstances in connection with the words employed." *Hermel, Inc. v. State*

*Tax Comm'n*, 564 S.W.2d 888, 897 (Mo. banc 1978).  However, a case does not involve

the construction of a revenue law if the law at issue has already been interpreted by the

Supreme Court, and the appellate court can dispose of the issue by merely applying that

construction of the law to the facts of the case.  *Twelve Oaks Motor Inn v. Strahan,* 96

S.W.3d 106, 108-09 (Mo. App. S.D. 2003); *Equitable Life Assurance Soc'y of*

*U.S./Marriott Hotels, Inc. v. State Tax Comm'n of Mo.*, 852 S.W.2d 376, 383 (Mo. App.

E.D. 1993).

In the instant case, the Commission assessed a five percent addition to tax penalty

against SEBA finding that SEBA was negligent in its report of its taxable sales because it

failed to keep adequate records and what records it did retain were inconsistent.  The

General Assembly did not define "negligence" in Chapter 144.  SEBA relies on *Hiett v.*

*Director of Revenue*, 899 S.W.2d 870, 872 (Mo. banc 1995) to argue that the proper

definition of "negligence" is a failure to make a reasonable attempt to comply with the tax

laws.  However, the *Hiett* court's definition of "negligent" referred to Missouri's income

7

tax statutes contained in Chapter 143 rather than Missouri's sales tax laws contained in Chapter 144. Furthermore, the Department urges this court to define "negligence" as the federal government did in 26 U.S.C. § 6662 (2018) to "include[] any failure to make a reasonable attempt to comply with the provisions of [the Internal Revenue Code]. . . ." Because the meaning of "negligence" as it pertains to section 144.250 has not been provided by the General Assembly nor has it been defined by our Supreme Court, we lack jurisdiction to construe its meaning. *See Hiett*, 899 S.W.2d at 871-72 (Supreme Court finding it had exclusive jurisdiction to define "negligence" under Chapter 143).

The Department argues that this court has jurisdiction to hear this appeal pursuant to *Armstrong-Trotwood, LLC v. State Tax Commission,* 516 S.W.3d 830 (Mo. banc 2017). It argues that the 5% addition to the tax assessed pursuant to section 144.250.3 constitutes a penalty provision and the interpretation of this provision does not constitute the "construction of the revenue laws of this state." *Id.* at 834. We disagree. In *Armstrong-Trotwood*, the question before the court addressed the way in which certain counties assessed real property and the impact of those assessments on the tax burden of property owners on the cost of operation of multi-county taxing districts. *Id.* The Supreme Court held that in order to fall under the provisions of article V, section 3 the issue must satisfy three elements: "(1) construction (2) of revenue laws (3) of this state." *Id.* (quoting *Alumax Foils, Inc*. at 910). The Court held, in part, that the proper determination of the assessment of real property affects the revenue of political subdivisions of the state, but not a revenue law "of the state." *Id.* In contrast, the collection of state sales taxes directly affects an income stream to the state. Section 144.250.3 specifically refers to the five percent penalty

8

provision as "added to the tax" and as an "addition to tax" and these amounts are deposited into the state treasury. We find that the interpretation of the penalty provisions of section 144.250.3 fall within the exclusive jurisdiction of the Supreme Court under article V, section 3. *State ex rel. Goldberg v. Barber & Sons Tobacco, Inc.*, 649 S.W.2d 859, 860 (Mo. banc 1983)(exercising original appellate jurisdiction where taxpayer challenged assessment of interest and penalties on delinquent tax liability).

Even if some but not all of the issues presented in this case fall within the exclusive jurisdiction of the Supreme Court, appeals are not bifurcated and the "appeal is properly lodged in the court having jurisdiction over all issues in the case." *State ex rel. Union Elec. Co. v. Pub. Serv. Comm'n,* 687 S.W.2d 162, 165 (Mo. banc 1985). Therefore, this matter must be transferred to the Supreme Court for full resolution of the issues presented.

## Conclusion

This case is hereby transferred to the Supreme Court of Missouri pursuant to article V, section 11 of the Missouri Constitution.

_____
Gary D. Witt, Judge

All concur